CHARLES V. RUTLEDGE y WILLIAM TAYLOR, haciendo negocios bajo el nombre de DAIRICREAM CO., demandantes y apelados, *v.* JAMES B. GILL, demandado y apelante.

Número 11465.

*Sometido:* 11 de abril de 1955. *Resuelto:* 27 de septiembre de 1955.

*Abelardo Ruiz Suria,* abogado del apelante; *James R. Beverley* y *Francisco Castro Amy,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Para principios del año 1951, Charles V. Rutledge, un residente del Estado de Tejas y William Taylor se asociaron bajo el nombre de "Dairicream Co." con el propósito de explotar el negocio de mantecados en Puerto Rico mediante la venta de mezcla para mantecado, la maquinaria necesaria para preparar dicho mantecado para su venta al consumidor y el establecimiento de tiendas a través de la Isla en asociación con otras personas. Uno de ellos, Rutledge, tenía un contrato con la Rochester Dairy Cooperative del Estado de Minnesota, a virtud del cual dicha cooperativa convino en preparar para el uso exclusivo de Rutledge una mezcla en polvo para mantecado bajo el nombre de "Dairicream".

En una de sus visitas a Puerto Rico, Rutledge conoció a James B. Gill y convino con éste en asociarlo en la explotación de la primera tienda "Dairicream" que se estableciera en esta isla. Después de varias gestiones en las que tomó parte activa William Taylor, se obtuvo un arrendamiento por el término de cinco años de un solar situado en la Avenida Ponce de León núm. 1959, Parada 27, Santurce, P. R., y un permiso de la Junta de Planificación de Puerto Rico para construir en dicho solar una tienda para la venta de mantecados, a condición de que la misma se removiese al expirar el término de cinco años. En agosto de 1951, Rutledge y Gill otorgaron un contrato de sociedad para la explotación de dicha tienda, en virtud del cual Gill convino en administrar el negocio, bajo ciertas condiciones que es innecesario mencionar ahora. Debido a divergencias personales que surgieron, entre Gill y Taylor, Rutledge acordó con Gill la disolución de la sociedad existente entre ellos. Dicha disolución se llevó a cabo el día 29 de noviembre de 1951 por virtud de un acuerdo titulado "Dissolution of Partnership Agreement". Una de las causas para la disolución de la sociedad era el otorgamiento de un

contrato entre las partes para la venta a Gill de la tienda "Dairicream" situada en la Avenida Ponce de León núm. 1959, Santurce, P. R.

En la misma fecha antes indicada, Rutledge y Gill otorgaron en inglés un contrato titulado "Purchase Agreement and Agreement for Operation of Business", en el cual eran partes también Rutledge y Taylor, haciendo negocios bajo el nombre de "Dairicream Co.". Por virtud de este contrato Rutledge vendió y traspasó a Gill todo su título, derecho e interés sobre el establecimiento "Dairicream" localizado en la Avenida Ponce de León núm. 1959, Parada 27, Martín Peña, Santurce, P. R. por un precio de $9,660.70, que resultaba ser igual a la inversión de Rutledge en dicho establecimiento. En el mismo contrato Gill acordó con Rutledge y Taylor, estos últimos haciendo negocios bajo el nombre de "Dairicream Co.", que él continuaría operando el referido establecimiento como una tienda "Dairicream" con derecho a usar dicha marca de fábrica bajo los siguientes términos y condiciones: [1]

(a) Gill tendría derecho exclusivo a operar una tienda "Dairicream" en el área de Martín Peña, Santurce, P. R.

(b) Gill usaría solamente en dicho establecimiento "Dairicream" mezcla para mantecado comprada a, y por conducto de, Rutledge y Taylor, o sus cesionarios, a un precio que sería no más de 12¢ por libra sumados al costo total del producto depositado en los muelles de San Juan.

---

[1] El texto original de estos términos y condiciones es como sigue:

"C—It is now further agreed between James Gill and C. V. Rutledge and William Taylor, doing business as 'Dairicream Co.', that James B. Gill will continue to operate said business as a 'Dairicream' store, with the right to the use of such trade name and mark, under the following terms and conditions:—1—James B. Gill will have the exclusive right to operate as a 'Dairicream' store within the area of 'Martín Peña', Santurce, San Juan, Puerto Rico.—2—James B. Gill will only use in said 'Dairicream' store mix purchased through C. V. Rutledge and William Taylor doing business as 'Dairicream Co.', or their assigns at a price which shall be no more than twelve cents per pound ($0.12) added to the total cost of said mix to 'Dairicream Co.' deposited at San Juan docks.—3—James B. Gill will at all times keep and maintain the 'Dairicream' store, fixtures and

(*c*) Gill mantendría en todo momento el establecimiento, su mobiliario y equipo bajo las mejores condiciones higiénicas y sanitarias, cumpliendo con las leyes, reglamentos y requisitos de las autoridades federales, insulares o municipales, teniendo derecho Rutledge y Taylor a inspeccionar el establecimiento en horas laborables para los fines de lo pactado en esta cláusula (*d*). A este acuerdo se le fijó un término de cinco años.

En virtud de este contrato Gill continuó operando la tienda "Dairicream" de Martín Peña.

En mayo de 1952, Charles V. Rutledge y William Taylor, haciendo negocios bajo el nombre de "Dairicream Co." interpusieron el presente litigio contra James B. Gill reclamándole daños y perjuicios por incumplimiento del contrato arriba mencionado. En su demanda alegaron que aproximadamente desde el mes de marzo de 1952 Gill "se ha negado a comprar y usar y a seguir comprando y usando el referido producto [mezcla para mantecados "Dairicream"] de los demandantes y ha descontinuado operando el mencionado negocio [tienda de Martín Peña] bajo el nombre de "Dairicream" estando en la actualidad operándolo bajo el nombre de "Tastycream" y comprando mezcla para mantecado (ice-cream mix) a otras personas." Alegaron además, que ellos han estado dispuestos y en condiciones de vender al demandado todas las cantidades de mezcla para mantecado que necesitare y solicitare para la explotación de su negocio y que el demandado ha estado comprando a otras personas, y usando en su negocio un pro-

---

equipment under the highest standards of hygiene and sanitation, with the compliance to all laws, rules and regulations promulgated by federal, insular or municipal authorities, and 'Dairicream Co.', its assigns, and their agents or employees, will have the right to inspect the premises and store at suitable business hours for the purposes of looking over its sanitary conditions and *to show them to prospective 'Dairicream' store operators in other areas.*—4—This agreement will last for a term of five (5) years from the date hereof. 5—The convenants herein contained shall bind, and the benefits and advantages shall inure to, the respective heirs, executors, administrators, successors or authorized assigns of the parties hereto. Whenever used, the singular shall include the plural, the plural the singular, and the use of any general (sic) shall be applicable to all genders.—"

medio mínimo de 715 libras semanales de mezcla para mantecado. Finalmente estimaron que habían sufrido daños y perjuicios en la suma de $22,300 por el incumplimiento del demandado de su obligación de comprar solamente a ellos mezcla para mantecado, y en $10,000 por dejar de operar su negocio bajo el nombre y marca de fábrica "Dairicream".

Contestó el demandado aceptando el hecho del otorgamiento del contrato titulado "Purchase Agreement and Agreement for Operation of Business" y admitiendo que desde antes de marzo de 1952 no había comprado ni usado el producto de los demandantes en su establecimiento y que descontinuó de operar dicho negocio bajo el nombre de "Dairicream" y que al presente lo operaba bajo el nombre de "Tastycream" comprando la mezcla para mantecado a otras personas. Como defensa alegó que si ha habido incumplimiento o violación alguna del susodicho contrato, ello ha sido por parte de los demandantes y no por parte del demandado.

Varios meses después el demandado interpuso una contrademanda alegando que para enero o febrero de 1952 los demandantes dejaron de suplirle mezcla para mantecado, sin justificación alguna, lo que le obligó a rescindir el contrato que existía entre ellos y por cuya razón se vió obligado a comprar mezcla para mantecado en el mercado local a precios más altos. Solicitó en concepto de daños y perjuicios, el exceso en precio pagado por él en el mercado local y daños generales sufridos por su establecimiento.

Celebrado un juicio en los méritos el tribunal a quo dictó sentencia declarando sin lugar la contra-demanda y con lugar la demanda, condenando al demandado a pagar a los demandantes en concepto de daños y perjuicios, la suma de $13,338.00, más las costas y $375 para honorarios de abogado. Al dictar esta sentencia la corte a quo formuló, entre otras, las siguientes conclusiones de hecho:

"13—Para principios de diciembre de 1951, mientras estuvo de visita en el continente, Gill notificó por teléfono a Rutledge que necesitaba mezcla para mantecado.

"El día 14 de diciembre de 1951, Rutledge informó por carta a Gill que había ordenado a la Rochester Dairy Cooperative dos embarques de mezcla para mantecado, uno de 2,500 (dos mil quinientas) libras y otro de 3,750 (tres mil setecientos cincuenta) libras.

"Las partes habían convenido que Gill pagaría por el referido primer embarque de 2,500 libras del producto en el momento en que el mismo llegase a Puerto Rico, pero que todo otro embarque sería pagado por Gill al momento de él ordenarlo, y que éste enviaría su cheque en o para enero 1, 1952, a favor de Rutledge en pago del segundo embarque de 3,750 libras del producto que Rutledge ya había ordenado a la Rochester Dairy Cooperative.

"Allá para el 8 de enero de 1952, Taylor avisó con copia del correspondiente conocimiento de embarque y demás documentos, al Sr. Eduardo Acosta, Administrador del negocio de Gill, sobre la llegada del primer embarque de 2,500 libras del producto y requirió que la mercancía fuera pagada y levantada del muelle. Al día siguiente, Gill pagó el importe de dicho embarque y levantó la mercancía del muelle.

"14—Debido a una huelga portuaria en el continente, no fué hasta el 19 de febrero de 1952 que salió el segundo embarque de aproximadamente 2,900 libras del producto. Dicho embarque arribó a Puerto Rico el día 28 del mencionado mes.

"15—El 26 de febrero de 1952, el Lcdo. Abelardo Ruiz Suria en representación de Gill, se dirigió por carta a Rutledge quejándose de la dificultad en obtener de ellos un abasto de mezcla para mantecado a tiempo, y le sugirió la rescisión del contrato de noviembre 29 de 1951. A dicha carta contestó Rutledge informando al Lcdo. Ruiz Suria que hacía ya un tiempo no recibía de Gill contestación a cartas que le había dirigido; que Gill no le había enviado dinero alguno para comprarle la mezcla y que por dicha razón no había colocado órdenes algunas para Gill. Le indicó además que estaba en tránsito un cargamento de 58 cajas del producto, y finalmente rechazó la propuéstale rescisión del contrato.

"El 29 de febrero de 1952, el día siguiente de haber llegado el segundo embarque del producto, y nuevamente el día 4 de marzo de 1952, Taylor informó por escrito al Lcdo. Ruiz Suria que estaban deseosos y dispuestos a servirle a Gill y que tenían una cantidad razonable de la mezcla en existencia, pero que para poder suplirle a tiempo el producto era necesario que Gill les

diera un estimado de sus necesidades de manera que ellos pudieran colocar con el productor las órdenes necesarias.

"16—Gill tuvo conocimiento de las antes mencionadas cartas de Rutledge y Taylor por conducto del Lcdo. Ruiz Suria. En ningún momento antes o después envió dinero para cubrir el segundo embarque del producto, ni inquirió por teléfono, personalmente o a través de uno de sus empleados o agente sobre el mismo.

"17—En marzo 7, 1952, Gill escribió a Rutledge informándole que por su abogado y por cartas recientemente recibidas por éste de Taylor, por primera vez tenía conocimiento de que se había recibido mezcla para mantecado en Puerto Rico, sin que se le hubiera notificado; y que en su consecuencia daba por terminado el contrato otorgado el 29 de noviembre de 1951 y había descontinuado usando el nombre y marca de fábrica "Dairicream", en su establecimiento.

"18—Según quedó estipulado por las partes en Corte abierta, el demandado Gill ha venido comprando para su negocio un promedio mensual de 115 cajas de mezcla para mantecado que contienen cada una 25.5 libras del producto, desde noviembre 29 de 1951 hasta el presente.

"19—La mezcla para mantecado comprada a los demandantes a tenor con las disposiciones del contrato de noviembre 29, 1951 y según lo entendieron las partes, le costaba al demandado 12¢ por libra sobre el costo del producto a los demandantes, depositado en los muelles en San Juan, que resultaba ser un costo total de 49¢ por libra. El producto que ha venido comprando el demandado a otras personas dice haberlo pagado a un precio promedio aproximado de 57¢, o sea, 8¢ por libra sobre lo que le hubiera costado de haberlo seguido comprando a los demandantes. Sin embargo, para la fecha de la vista de este caso ya el demandado Gill se estaba dedicando al negocio de venta y distribución de mezcla para mantecado y otros negocios similares, en abierta competencia con los demandantes e indefectiblemente con propósito de lucro para obtener un costo menor para la mezcla para mantecado que él tenía que usar en su propio negocio. Estos actos del demandado con posterioridad a su quebrantamiento del contrato, convirtiéndose en distribuidor de otra u otras mezclas para mantecado para venta en Puerto Rico, es una circunstancia evidenciaria de gran utilidad en la dilucidación de la controversia en este caso."

El demandado contra-demandante apeló y en su alegato señala la comisión de ocho errores.

La corte sentenciadora resolvió que bajo el contrato titulado "Purchase Agreement and Agreement for Operation of Business", al cual nos referiremos en adelante como "el Contrato", el demandado Gill venía obligado a continuar operando su negocio con el nombre de "Dairicream" por el término de cinco años y a comprar solamente a los demandantes la mezcla para mantecado que necesitare para dicho negocio durante el mencionado término de año. El primer error señalado por el apelante va dirigido a atacar esta conclusión, la que a juicio suyo envuelve una interpretación errónea del contrato. A este efecto, se expresa así en su alegato: "Erróneamente, el tribunal inferior impuso a este demandado mediante tal interpretación del contrato una obligación donde lo que, por el contrario, fué una concesión (franquicia) de un derecho. El contrato claramente lo que hace es concederle al demandado el derecho a continuar operando su negocio con el nombre "Dairicream" sujeto mientras así lo operara a las condiciones expuestas en relación con dicha concesión pero indudablemente no le impuso la obligación de operarlo bajo dicho nombre por término alguno."

Discrepamos. A los fines de interpretar el "Contrato" no debemos, como lo hace el apelante, considerar sus partes y sus cláusulas aisladamente como si se tratara de dos transacciones independientes. Para juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato y si alguna cláusula de un contrato admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto. Además, las cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas. Arts. 1234, 1236 y 1237 del Código Civil (ed. 1930). *Caballero* v. *Kogan*, 73 D.P.R. 666. Convenimos con el siguiente razonamiento de la corte sentenciadora:

"Del propio contrato aparece, en primer lugar, que los demandantes concedieron al demandado el derecho exclusivo de funcionar una tienda "Dairicream" en el área de Martín Peña; o sea, que los demandantes no podían establecer ni cederle a ninguna otra persona el uso de su mezcla Dairicream en la región de Martín Peña, sobre la cual ellos, los demandantes, le habían dado la exclusiva al demandado.

"Aparece, además, de la prueba que el negocio que adquirió el demandado como dueño exclusivo a virtud de dicho contrato y que entonces estaba ya encaminado y en funcionamiento, le fué vendido por el co-demandante Rutledge por su mero costo. Y forzosamente es concluir que dicho negocio fué vendido al demandado a su costo en consideración y como causa de las obligaciones que recíprocamente asumía en dicho contrato el demandado, cual era de comprar solamente a los demandantes su mezcla de mantecado Dairicream.

"Otra causa de las obligaciones del demandado bajo el contrato fué la disolución coetánea de la sociedad existente entre el demandante Rutledge y el demandado, según lo expresa claramente el contrato de disolución de sociedad, que fué el *Exhibit* I del demandado, y más aún, aunque el contrato no lo dice expresamente, se deduce necesariamente del mismo y de los actos de las partes, que los demandantes se comprometieron a vender al demandado la mezcla para mantecado que éste necesitase para su negocio durante el término del contrato tanto como el demandado correlativamente venía obligado a comprar, pues lo último es inseparable e inconcebible sin lo primero."

Arguye el apelante que en vista de que las partes conocían que el contrato de arrendamiento del solar donde enclava el negocio (tienda Dairicream) había sido cancelado, sustituyéndose por uno verbal de mes a mes así como que sobre dicho solar el Gobierno proyectaba la construcción de una avenida en un futuro indeterminado, sería ilógico interpretar que fué la intención de las partes que dicho apelante se obligara a operar el negocio por término específico de cinco años bajo el nombre de "Dairicream", sin haberse insertado en el contrato las cláusulas correspondientes para relevarlo de tal obligación en caso de que los dueños del solar le requiriesen para que desocupara el mismo o el Gobierno procediese a la expropiación del sitio para la avenida en proyecto.

El apelante se olvida, sin embargo, de que a él se le concedió el derecho exclusivo a explotar una tienda Dairicream, en toda el área de Martín Peña, y que no estaba, por tanto, limitado al sitio o solar arrendado.

·La fijación de un término de 5 años para la duración de un contrato, como el que nos ocupa, y el cual, impone obligaciones recíprocas a las partes, a Gill de comprar, y a Rutledge y Taylor de vender, mezcla para mantecado "Dairicream", milita fuertemente contra la contención del apelante al efecto de que él podía rescindir a su voluntad el contrato antes de su vencimiento simplemente dejando de usar el nombre "Dairicream". Véase art. 1080 del Código Civil (ed. 1930).(²) *Cf. Arecibo Motors Co.* v. *Caribe Motors Corp.*, 60 D.P.R. 401. En su consecuencia, concluimos que el primer error no fué cometido.

▆ Los errores 2, 3 y 8 los enuncia el apelante, así:

"2)—*El tribunal inferior incurrió en manifiesto error al concluir a base de la prueba aportada en el caso que (a) este demandado repudió su contrato con los demandantes y, al hacerlo, faltó a su cumplimiento sin justificación alguna y (b) que los demandantes estaban dispuestos y deseosos de suplirle el producto al demandado. (L. de la S. Pág. 67).*

"3) *El tribunal inferior incurrió en manifiesto error de apreciación de la prueba en este caso al concluir que los demandantes estaban dispuestos a su vez a cumplir su contrato con este demandado, así como al concluir que los demandantes no faltaron al cumplimiento del contrato antes de su rescisión por este demandado. (L. de la S. Págs. 68–71).*

"8) *El tribunal inferior incurrió en manifiesto error de apreciación de la prueba en este caso al no concluir que los demandantes dejaron de cumplir su contrato para con este demandado y que tal incumplimiento obligó a este demandado a rescindir el contrato y dar el mismo por terminado, e incurriendo*

---

(²) Dicho artículo dispone:

"Artículo 1080.—Término designado, se presume en beneficio del acreedor y deudor.—Siempre que en las obligaciones se designa un término, se presume establecido en beneficio de acreedor y deudor, a no ser que del tenor de aquéllas o de otras circunstancias resultara haberse puesto en favor del uno o del otro.

*así en manifiesto error al no declarar con lugar la contra-demanda en este caso y conceder a este demandado los daños y perjuicios correspondientes por el incumplimiento de los demandantes.*"

En síntesis, estos errores van dirigidos a atacar la conclusión formulada por la corte sentenciadora al efecto de que el demandado James B. Gill, "faltó al cumplimiento del contrato al repudiar el mismo en el mes de marzo de 1952 y dejar de comprar a los demandantes la mezcla para mantecado que necesitaba para su negocio, sin justificación y no obstante estar los demandantes dispuestos y deseosos de suplirle dicho producto", y que "la prueba no demuestra que los demandantes hayan dejado de cumplir obligación alguna para con el demandado."

Esta conclusión está basada en los hechos que dicho tribunal encontró probados y los cuales expuso en sus conclusiones de hechos número 13 a 17.  De una cuidadosa lectura de la transcripción de evidencia hemos quedado convencidos de que las referidas conclusiones están sostenidas por la prueba. No se nos ha demostrado que al dirimir el conflicto en la prueba en contra del apelante, la corte a quo actuara movida por pasión, prejuicio o parcialidad o que incurriera en manifiesto error, por lo que, en apelación, no intervendremos con las mencionadas conclusiones de hecho. *Correa* v. *Mario Mercado e Hijos*, 72 D.P.R. 80; *Santiago* v. *Rodríguez*, 72 D.P.R. 266; *Sucn. Muñoz* v. *Cepeda*, 72 D.P.R. 593; *Palmer* v. *Barreras*, 73 D.P.R. 278; *Sucn. Marrero* v. *Santiago*, 74 D.P.R. 816.  Por tanto, estos errores no fueron cometidos.

■ Por los señalamientos cuarto, quinto y sexto, sostiene el apelante que los demandantes no aportaron prueba suficiente alguna para establecer los daños y perjuicios que realmente sufrieron y el valor razonable determinado o determinable de los mismos habiendo sido éstos fijados por el tribunal sentenciador a base de especulación.  Sostiene además que la concesión de daños y perjuicios era improcedente toda vez que la corte a quo concluyó que el 5 de marzo de 1952, fecha an-

terior a la radicación de la demanda, los demandantes traspasaron la marca de fábrica "Dairicream" a la corporación Dairicream, Inc., pero que el "Contrato" nunca fué cedido por ellos a dicha corporación.

Al sostener estos errores, el apelante arguye que los demandantes no demostraron que ellos hubieran podido suplir la mezcla de mantecado a su establecimiento durante tiempo alguno y por cantidad alguna. Funda esta aseveración en que con excepción de las 2,500 libras del producto servídole a él, las otras cantidades recibidas por el demandante Taylor fueron utilizadas en establecimientos similares que se habían abierto en Río Piedras y Hato Rey y en los cuales los demandantes tenían el mayor interés propietario; y además, en que el propio demandante Rutledge le había expresado por escrito que cada día aumentaban las dificultades para obtener la preparación y embarque del producto.

La prueba creída por la corte sentenciadora, demostró, sin embargo, que estas razones, no imposibilitaban a los demandantes de suplir al demandado la mezcla para mantecado que éste necesitare para su negocio. Los demandantes, infructuosamente le aconsejaron al apelante en repetidas ocasiones que les anticipara sus necesidades del producto a fin de que ellos pudieran tenerlo abastecido constantemente. También demuestra la prueba que al recibir informes los demandantes de que el apelante carecía del producto le ofrecieron de sus existencias. No podemos, pues, convenir con el apelante en que los demandantes dejaron de demostrar que ellos hubieran podido cumplir con el contrato de haber cumplido el demandado con su parte.

◼ En su conclusión de derecho número 4, la corte a quo resolvió que por el incumplimiento del contrato de parte del demandado, "los demandantes han dejado de percibir desde abril de 1952, hasta diciembre de 1953, 12¢ de ganancia por cada libra de mezcla para mantecado que el demandado necesitaba para su negocio, y que a base de un promedio mensual de 115 cajas de 25.5 libras cada una que el demandado ha ve-

nido comprando para su negocio desde que lo adquirió en noviembre 29, 1951, hasta diciembre de 1953, asciende a la suma de $7,371." En cuanto a los años 1954, 1955 y hasta noviembre de 1956, fecha de expiración del contrato, y sobre los cuales no hubo estipulación en cuanto a la cantidad de mezcla para mantecado que el demandado-apelante habría de consumir en su tienda, la corte sentenciadora estimó que sería un 50% menos de la que se estipuló ser hasta el día del juicio. A base de este cálculo resolvió que la ganancia que los demandantes dejarían de percibir durante dicho período sería de $5,967. Las sumas de estas dos cantidades constituyen el monto de los daños y perjuicios concedidos en la sentencia apelada.

Arguye el apelante que el contrato no fijó la ganancia como una de 12¢ por libra, sino que limitó el precio a una cantidad no mayor de 12¢ adicionados al costo del producto depositado en los muelles de San Juan y que de esta manera las partes fijaron el precio máximo que los demandantes podían cobrar al demandado pero que ciertamente en cualquier momento podía haber sido menos de tal precio máximo.

Taylor declaró que vendió al demandado y a otros clientes a razón de 49½¢ por libra y que a ellos les costaba el producto 37½¢ por libra depositado en los muelles de San Juan. Declaró además que es costumbre en los Estados Unidos cobrar 30¢ por galón líquido que viene a ser 12¢ por libra; que ésa fué la forma como determinaron el precio y así lo hicieron constar en el contrato para que sus clientes supieran cuál era la ganancia que ellos obtenían y que ésa (12¢ por libra) era su ganancia. De otra parte, el propio demandado declaró que él compró otras marcas de mezcla para mantecado a razón de 57.7, 58 y 60¢ por libra.

En vista de esta prueba no podemos resolver que la corte sentenciadora cometiera error al fijar en 12¢ por libra, la ganancia dejada de percibir por los demandantes. Si bien esta ganancia era sobre muelle y uno de los demandantes de-

claró que ellos incurrían en gastos de viaje, no sería razonable deducir ese gasto en su totalidad de la ganancia que les produciría el contrato con el demandado ya que éste no era la única persona a quien los demandados vendían mezcla para mantecado. Sin embargo, en el récord no hay prueba de que los demandantes incurrieran en tales gastos de viaje durante el período que determinaremos debe tomarse como base para computar las ganancias que ellos dejaron de percibir. Por esta razón no insistiremos en la discusión del error relacionado con la medida utilizada por la corte a quo para determinar los daños y perjuicios sufridos por los demandantes.

En julio de 1952, cuando ya el demandado había repudiado el contrato tanto de hecho como por notificación escrita a los demandantes, éstos traspasaron y cedieron la marca de fábrica "Dairicream" a la corporación "Dairicream, Inc."(³) El "Contrato" sin embargo, no fué cedido a esta corporación ni a ninguna otra persona. A pesar de tal cesión, la corte a quo, determinó que los demandantes debían también ser resarcidos de los daños (ganancias dejadas de percibir) desde la fecha de la cesión de la marca de fábrica y hasta la fecha del vencimiento del contrato. En otras palabras, determinó que los demandantes tenían derecho a todas las ganancias que hubieran percibido bajo el contrato hasta su expiración, sin tomar en consideración que éstos habían cedido la marca de fábrica "Dairicream" mucho antes del término de vencimiento del contrato. Los demandantes no probaron que a pesar de dicha cesión ellos conservaban el derecho de usar, a su voluntad, la marca de fábrica cedida con exclusión de la propia cesionaria o que ésta no estaba autorizada por el contrato de cesión a conceder el uso exclusivo de dicha marca de fábrica a cualquier persona en el área de Martín Peña, obligándose así a respetar el "contrato", o algo parecido. A falta de ésa u otra prueba al mismo efecto, carece de funda-

---

(³) La fecha de esta cesión fué estipulada por las partes. Sin embargo, la corte a quo erróneamente concluyó que dicha cesión se efectuó el 5 de mayo de 1952.

mento la reclamación de daño, calculado éste a base de ganancias dejadas de percibir, desde la fecha de cesión de la marca de fábrica en adelante.

Es doctrina sancionada por la jurisprudencia que el mero incumplimiento de las obligaciones contractuales, no lleva aneja la indemnización de daños y perjuicios, conforme al art. 1124 del Código Civil Español, equivalente al 1077 del nuestro, (ed. 1930) sino que es necesario *justificar su realidad* y la relación directa en su caso con el hecho que los originó. Sentencias del Tribunal Supremo de España, de 19 de diciembre de 1930; 22 de diciembre de 1930; 23 de junio de 1925; 5 de mayo de 1925; 2 de febrero de 1926; 10 de noviembre de 1907; 11 de noviembre de 1908; 25 de abril de 1912.

No encontramos razón justificada para conceder daños y perjuicios a los demandantes, derivados del no uso y no compra del producto "Dairicream", por el demandado a partir de la fecha en que aquéllos se desprendieron de todo derecho de propiedad sobre dicha marca de fábrica. Los demandantes han dejado de justificar la existencia de daños y perjuicios (lucro cesante) a partir de dicha cesión y no procede su concesión.

Como consecuencia de lo antes expuesto, los demandantes deben ser indemnizados en las ganancias dejadas de percibir durante los meses de abril, mayo, junio y julio de 1952. Conforme la estipulación de las partes, el promedio de venta durante esos meses era de 115 cajas mensuales de mezcla para mantecado de 25.5 libra cada una.

Durante los referidos cuatro meses el demandado dejó de comprar a los demandantes 460 cajas conteniendo un total de 11,730 libras de mezcla para mantecado. Como la ganancia por libra era de 12¢, los demandantes hubieran percibido un beneficio total de 12¢ multiplicado por 11,730 que es igual a $1,407.60. Esta suma representa la cuantía de la indemnización a que ellos tienen derecho.

En vista de lo expuesto, *la sentencia apelada será modifi-*

714

*cada, rebajando la indemnización concedida a $1,407.60 y así modificada será confirmada.*

El Juez Asociado Sr. Belaval concurre en el resultado.