ROBINS FARMS, INC., demandante y recurrente, *v.* NARCISO CORREA, GREGORIO NIEVES ET AL., demandados y recurridos.

*Número:* 11950   *Resuelto:* 9 de marzo de 1962

---

*McConnell, Valdés & Kelly* y *Fowler V. Harper,* abogados de la recurrente; *Ramón Gandía Biscombe,* abogado de la Autoridad de Tierras; *Rivera Zayas* y *Rivera Cestero & Rúa* y *A. Segurola,* abogados de la Globe Indemnity Company y Narciso Correa, recurridos; y *José R. Fournier,* abogado de Gregorio Nieves, recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Santana Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La demandante, Robins Farms, Inc., radicó en 26 Octubre 1953 demanda de daños y perjuicios contra Narciso Correa y Gregorio Nieves, agricultores de Vega Alta, alegando que ellos utilizaron y regaron en sus fincas el yerbicida conocido como "2-4-D" sin tomar precauciones para evitar daños a las propiedades vecinas; que los vientos llevaron el yerbicida hasta las cercanas plantaciones de tomate

de la demandante causando la destrucción de las mismas, daños que valora en $40,000.00; y que las pérdidas sufridas por la demandante se debieron única y exclusivamente a los actos de los dos mencionados demandados. Dos meses y 23 días después de radicada la demanda la demandante radicó una demanda enmendada incorporando a la Autoridad de Tierras de Puerto Rico y a la Globe Indemnity Co. (aseguradora hasta $5,000.00 de la Autoridad) como codemandadas, y alegando que los demandados almacenaron y/o utilizaron el yerbicida 2-4-D en sus fincas sin tomar precauciones, ocasionándole los daños ya expresados.

Celebrado el juicio en sus méritos el Tribunal Superior declaró sin lugar la demanda. La recurrente señala que el tribunal de instancia erró (1) al negarse a corregir el acta de la inspección ocular en cuanto a dos extremos; (2) al no determinar que los tres demandados utilizaron el 2-4-D; (3) al no determinar que cada demandado causó o contribuyó a causar el daño a la demandante en ausencia de prueba al efecto de que el daño fue causado por otras personas; (4) al no hallar a los demandados incursos en responsabilidad civil (a) independientemente de si fueron negligentes o no, (b) o por haber sido negligentes, (c) o por haber creado un estorbo; (5) al determinar que aún en el caso de que el 2-4-D hubiese emanado de las fincas de los demandados debido a su negligencia, dicha negligencia no fue la causa próxima de los daños; y (6) al estar prejuiciado contra la demandante.

No es necesario discutir el primer error señalado porque aunque el acta de inspección ocular se hubiese enmendado tal como lo deseaba hacer la demandante en nada hubiese variado la decisión nuestra en este caso debido a las conclusiones a que hemos llegado respecto a la prueba.

Los errores restantes están tan relacionados entre sí que los discutiremos conjuntamente. Para ello es necesario examinar más de cerca los hechos del caso. La Autoridad de

Tierras tiene como uno de sus propósitos el "facilitar el aprovechamiento de las tierras para el mayor bien público bajo planes de producción eficiente y económica" y la ley le instruye a "efectuar todos los actos conducentes al más científico, económico y eficiente disfrute de las tierras" de Puerto Rico.  Art. 7, Ley Núm. 26 de 12 de abril 1941; 28 L.P.R.A. sec. 247.  En descargo de esos deberes la Autoridad de Tierras a fines del año 1952 celebró un contrato con Robins Farms, Inc. para que ésta estableciese una finca para la producción agrícola mediante el sistema conocido por "hidropónico", que consiste en cultivar plantas en soluciones de agentes químicos y agua en vez de cultivarlas directamente en el terreno.  (Presumiblemente esta forma de hacer agricultura produce mayor rendimiento que la forma tradicional, aunque requiere una mayor inversión de capital.)  Expresa el mencionado contrato en sus por cuantos que la instalación y operación de esa manera de producción agrícola era necesaria en Puerto Rico y sería beneficiosa para la economía del país, y que la Autoridad convenía en ciertas condiciones y compromisos con Robins como un incentivo para que Robins llevase a cabo el mencionado proyecto agrícola.

En sus conclusiones de hecho el juez sentenciador expresa que Robins Farms, Inc. fue organizada a fines de 1952 y que su capital era de $42,700.00 incluyendo $10,000.00 que le prestó el Banco Gubernamental de Fomento.  Robins Farms, Inc. le pagaría a Robins un sueldo anual de $10,000.00. Las condiciones más importantes del antes mencionado contrato entre la demandante y la Autoridad de Tierras son las siguientes:  La Autoridad le arrendó a la demandante un predio de terreno sito en Vega Alta;  le concedió a la demandante la opción de comprar dichos terrenos;  le gestionaría exención industrial de contribuciones y si no se la conseguía dentro de 12 meses desde la fecha del contrato la Autoridad, a opción de la demandante, vendría obligada a comprarle a la demandante todas las instalaciones, equipo, tan-

ques, edificaciones, etc., que la demandante tuviese en dicho terreno, al precio de costo menos depreciación (precio que no podría exceder de $100,000.00) más una suma equivalente al diez por ciento del precio que resultase, por concepto de servicios de construcción (cuya suma no podría exceder de $10,000.00).

Comenzó la demandante a operar su finca, que dedicó exclusiva o mayormente a la producción de tomates, y las primeras dos cosechas produjeron entradas brutas de $9,548.99 y $11,587.99. Fue para la tercera cosecha que la plantación de tomates (unas 3 cuerdas) se deterioró en gran medida y esta cosecha sólo produjo entradas brutas por $2,345.15. A fines de enero o principios de febrero de 1954 Robins ejercita su opción de vender y vende a la Autoridad las construcciones que había hecho en el terreno por el importe de su costo, el cual fijaron en $54,000.00. Desde 15 de febrero de ese año de 1954 Robins pasa a ser un empleado de la Autoridad de Tierras con un sueldo anual de $10,000.00. La Autoridad ocupa a Robins encargándolo de la administración de esa misma finca "Hidropónica" de Vega Alta. A la fecha del juicio (Nov. 1955) Robins continuaba empleado por la Autoridad.

En síntesis, la alegación enmendada de la demandante es al efecto que ella inició el cultivo de tres cuerdas de tomates para principios del año 1953 y que para junio de ese año la siembra quedó destruida debido a la acción del 2-4-D que los demandados Correa y Nieves utilizaron en conexión con su cultivo de caña de azúcar y que la codemandada Autoridad de Tierras almacenó y utilizó en conexión con su cultivo de piñas, todo ello en terrenos adyacentes o muy cercanos a los de la demandante.

La demandante alega que el tribunal a quo cometió error al no determinar que los tres demandados utilizaron el 2-4-D (Error Núm. 2). La prueba es decididamente conflictiva. Los tres demandados negaron que hubiesen utilizado el 2-4-D.

La prueba demostró que Nieves se dedica a la ganadería y no al cultivo de caña de azúcar. Hay prueba de que Correa compró para esos meses algunas cantidades de ese yerbicida pero no la hay de que lo utilizó. Igualmente ocurre con la Autoridad. Hay evidencia de que tenía algunos envases de dicho yerbicida pero no hay un solo testigo que declare que lo utilizó en las piñas. El Sr. Osvaldo González, quien para la fecha de autos administraba la plantación de piñas de la Autoridad que colinda con la finca Robins declaró categóricamente que no se usaban yerbicidas en la plantación de piñas. Son las declaraciones del presidente de la demandante el Sr. Robins y las de su ayudante Davis las que conectan a Correa y a Nieves con el uso del yerbicida. Ante este conflicto de prueba el tribunal de instancia declaró en sus conclusiones que no se probó que los demandados regaran el yerbicida. Sí se probó, mediante la declaración en el juicio de ellos mismos, que cinco agricultores cercanos a la finca Robins utilizaron el yerbicida 2-4-D. Era a dicho tribunal a quien competía dirimir el conflicto y no encontramos razones que justifiquen que variemos su determinación al respecto. *Pueblo* v. *Amadeo*, 82 D.P.R. 102 (1961); *Vargas* v. *Sánchez*, 79 D.P.R. 800 (1957); *Martín* v. *Torres*, 79 D.P.R. 391 (1956); *Rutledge* v. *Gill*, 78 D.P.R. 698 (1955). Opinamos que no se cometió el error número dos. Lo dicho sobre el error número dos hace innecesario discutir el número tres por ser éste un corolario del número dos pero nos trae de inmediato a la consideración del error número 6, el que plantea la cuestión de prejuicio del juez sentenciador contra la demandante. ■

Es cierto que durante el juicio el juez hizo varios comentarios que no debió haber hecho, los cuales demuestran su insatisfacción con la relación entre Robins y la Autoridad de Tierras y con los términos del contrato. Tomadas esas circunstancias (dicha relación y los términos del contrato) en forma aislada es comprensible la reacción del juez. Creyó

que el contrato era muy ventajoso para la demandante y que la Autoridad tomaba todos los riesgos mientras que Robins no podía perder. Aunque así fuese, lo que parece que no tuvo en mente el juez fueron los objetivos sociales, públicos, que mediante ese contrato y ese proyecto perseguía la Autoridad; objetivos que están mencionados en las anteriormente citadas disposiciones de la Ley de Tierras de Puerto Rico. El proyecto era una exploración en busca de maneras más productivas de hacer agricultura. Al evaluar la actitud del juez de instancia en el conjunto de todo este caso creemos que su inconformidad con las circunstancias mencionadas no fue de grado tal que viciaran los procedimientos en forma que amerite una revocación.

Al sostener la apreciación de la prueba que hizo el tribunal de instancia también queda implícito que no se cometió el error número cuatro. Al solicitarnos que hallemos a los demandados responsables civilmente independientemente de si fueron negligentes o no, la demandante nos pide que apliquemos al caso la regla o teoría de la responsabilidad absoluta. (¹) Según esta doctrina hay responsabilidad aún cuando no haya mediado negligencia alguna pero se aplica solamente a casos extraordinarios, excepcionales o anormales. No se aplica a situaciones usuales ni a los usos normales de la propiedad.(²) Para determinar lo que es una situación extraordinaria o anormal que justifique la aplicación de esta regla los tribunales toman en consideración la naturaleza de la actividad en cuestión, el lugar en donde y la forma cómo se llevó a cabo, los usos de la comunidad afectada y el grado de peligro que la actividad conlleva. Por ejemplo, explotar dinamita en un campo deshabitado al llevar a cabo una actividad útil y lícita requiere el uso de gran

---

(¹) Denominada en inglés "absolute liability" unas veces y "strict liability" otras.

(²) Prosser, *Law of Torts*, 2d. ed., 1955, sec. 59, p. 329.

prudencia pero probablemente no conllevaría responsabilidad absoluta; por el contrario dinamitar una estructura en plena ciudad conllevaría responsabilidad absoluta pues por más precauciones que se tomen el acto resulta demasiado peligroso, es inapropiado en ese lugar, es poco usual, etc. La responsabilidad absoluta se funda en que el que así actúa expone a sabiendas a la comunidad a un gran riesgo no importa que tome todas las precauciones posibles. Quien así actúa incurre en una conducta "socialmente irrazonable".[3] Esta regla crea, puede decirse, una culpa sin intención y sin negligencia, una culpa de contenido social.

Esta doctrina de responsabilidad absoluta por actividades extraordinarias es relativamente reciente y en los Estados Unidos todavía resulta controversial. Una serie de jurisdicciones estatales la han aceptado y otras jurisdicciones la han rechazado en forma explícita.[4] La doctrina se desarrolló mayormente desde el importante caso de *Rylands* v. *Fletcher* resuelto en Inglaterra en 1868.[5] Consideraciones de política pública han jugado papel importante en la aceptación o rechazo de la doctrina por las distintas jurisdicciones estatales en aquellos casos relacionados con el uso de yerbicidas e insecticidas.[6] Un tribunal de Pensilvania ha expresado que el imponer responsabilidad absoluta en una determinada actividad es esencialmente un problema de "ingeniería social".[7] Se ha señalado que en las jurisdicciones norteamericanas las vicisitudes de esta doctrina guardan mu-

---

[3] Prosser, obra citada, p. 318.

[4] Prosser, obra citada, p. 332–334.

[5] *Fletcher* v. *Rylands*, 3 H. & C. 774, 159 Eng. Rep. 737 (1865), revocado en *Fletcher* v. *Rylands*, L.R. 1 Ex. 265 (1866), confirmado en *Rylands* v. *Fletcher*, L.R. 3 H. L. 330 (1868).

[6] Véase *Booth* v. *Rome W. & O. Terminal R.R.*, 140 N.Y. 267, 278, 35 N.E. 592, 596 (1893); *Gulf Pipe Line Co.* v. *Sims*, 168 Okla. 209, 213, 32 P.2d 902, 906 (1934); *Pennsylvania Coal Co.* v. *Sanderson*, 113 Pa. 126, 155–56, 6 Atl. 453, 464 (1886); *Turner* v. *Big Lake Oil Co.*, 128 Tex. 155, 165–66, 96 S.W.2d. 221, 226 (1936).

[7] *Blake* v. *Fried*, 95 A.2d. 360, 365 (Pa. Super. 1953).

·cha relación con la clase de cosecha agrícola predominante ·en cada estado. Algunas jurisdicciones han sido renuentes .a aplicar la doctrina cuando el insecticida o yerbicida en ·cuestión es necesario para proteger las cosechas principales ·del estado.(8) Esa realidad jurisprudencial nos recuerda las siguientes palabras de Holmes: "Las consideraciones que los jueces rara vez mencionan, y siempre con timidez, son las raíces secretas de las cuales el derecho toma su jugo ·vital. Me refiero, desde luego, a las consideraciones de lo ·que es conveniente para la comunidad concernida. Cada principio importante que surge de la litigación es en realidad y fundamentalmente el resultado de consideraciones, más o menos claramente precisadas, de política pública."(9)

La distinguida representación legal de la demandante nos ·cita en su alegato un fragmento del lenguaje amplio utilizado por el Juez Blackburn.(10) Ese lenguaje fue substancial-mente limitado en apelación en la Cámara de los Lores. Lord ·Cairns en su opinión limitó el principio a los usos anormales ("non-natural") que los demandados dieron a sus terrenos. El énfasis de la opinión tal como quedó finalmente recae de-·cididamente sobre la actividad anormal e inapropiada a que los demandados, según el tribunal, dedicaron su terreno.(11) Resumiendo, la doctrina predominante reconoce la regla de la responsabilidad absoluta en los casos en que el demandado lleva a cabo una actividad que implica un alto grado de pe-·ligro para otros y que es anormal en la comunidad e ina-

---

(8) *Crop Dusting: Legal Problems in a New Industry,* nota en *6 Stan-ford Law Review 69* (1953).

(9) *The Common Law,* ed. de 1946, p. 35.

(10) En *Rylands* v. *Fletcher,* supra.

(11) Para una amplia discusión de este caso véase Prosser, *The Prin-ciple of Rylands* v. *Fletcher,* en *Selected Topics on the Law of Torts,* 1953, págs. 135, 139. Igualmente, y también sobre la teoría de la responsa-bilidad absoluta véase el capítulo 14 de Harper & James, *The Law of Torts,* ed. 1956, Vol. 2, p. 785 y ss. (Secs. 14.1 a 14.16); y la anotación *Liability for Injury Consequent Upon Spraying or Dusting of Crop.,* 12 A.L.R. 2d 436.

propiado en el lugar en que se realiza.($^{12}$)    Debido a las conclusiones a que hemos llegado sobre la prueba no tenemos que resolver en este caso si estaríamos dispuestos o no a introducir en nuestro derecho esta doctrina.

Lo señalado como el error número 5 no constituye error puesto que fue un comentario hipotético que hizo el juez sentenciador y que no constituyó base para su decisión.    No vemos razones para la imposición a la demandante de los $1,200.00 para honorarios de los abogados de los demandados. Por las razones expuestas *se confirmará la sentencia dictada por el Tribunal Superior, Sala de Bayamón, en 4 de noviembre de 1955 en este caso, excepto que se modificará en el sentido de eliminarle la imposición a la demandante de los honorarios de los abogados de los demandados.*

---

($^{12}$) Prosser, *Law of Torts*, 2d ed., 1955, sec. 59, p. 329.

