ACADEMIA SAN JORGE, querellada y recurrente, *v.* MANUEL APONTE ROSARIO ET AL., y JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, querellantes y recurridos.

Número: O-79-340          Resuelto: 30 de junio de 1980

*Martínez Álvarez, Fernández Paoli, Menéndez Monroig, Menéndez Cortada & Lefranc Romero,* abogados de la recurrente; *Héctor M. Collazo* y *Raúl M. Olmo Olmo,* abogados de los obreros recurridos; *Federico Díaz Ortiz,* abogado de la Junta de Relaciones del Trabajo de Puerto Rico.

SENTENCIA

Considerando que el ejercicio de la jurisdicción de la Junta de Relaciones del Trabajo de Puerto Rico, en las circunstancias particulares del caso de autos, conllevaría una intervención que confligiría con los derechos constitucionales de la recurrente —Art. II, Sec. 3 de la Constitución del Estado Libre Asociado de Puerto Rico— se desestima la querella.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario. El Juez Asociado Señor Martín emitió opinión concurrente a la cual se une el Juez Asociado Señor Dávila. El Juez Asociado Señor Negrón García emitió opinión concurrente a la cual se une el Juez Asociado Señor Díaz Cruz. El Juez Presidente, Señor Trías Monge, emitió opinión disidente a la cual se unen los Jueces Asociados Señores Rigau y Torres Rigual. El Juez Asociado Señor Rigau suscribe, además, una opinión disidente. El Juez Asociado Señor Irizarry Yunqué no intervino.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—O—

Opinión concurrente del Juez Asociado Señor Martín a la cual se une el Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 30 de junio de 1980

No cuestiono que bajo la Ley de Relaciones del Trabajo de Puerto Rico, la iglesia es un "patrono" sobre el cual tiene jurisdicción la Junta de Relaciones del Trabajo. *Junta Rel. Trabajo* v. *Club Deportivo*, 84 D.P.R. 515, 523 (1962). Considero, sin embargo, que en las circunstancias presentes en este caso median impedimentos constitucionales de elevado rango que militan contra el ejercicio de tal jurisdicción en casos como el de autos. Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 3. Véase *Diario de Sesiones de la Asamblea Constituyente de Puerto Rico*, T. IV, pág. 2563.

Es consustancial a la enseñanza de las escuelas religiosas el adelantamiento del credo religioso de la iglesia que la instituyó. *Lemon* v. *Kurtzman*, 403 U.S. 602 (1971). En cuanto a la Iglesia Católica, Apostólica y Romana, que opera la escuela involucrada en el caso de autos, véase *Gravissimum*

*Educationis* en Vaticano II, Santander, Ed. Sol Terrae, 1966, págs. 317, 324–325; Conferencia Episcopal de Puerto Rico, *Educación en las Escuelas Católicas de Puerto Rico* (Carta pastoral), 30 de marzo de 1976. La escuela es un instrumento más en el apostolado religioso que llevan a cabo las iglesias al cultivar su feligresía, y debe tenerse presente que los maestros de dichos planteles, sean laicos o sean religiosos, deben considerarse en su labor como partícipes en dicho apostolado, quedando sometidos, por tanto, al criterio de los jerarcas eclesiásticos en cuanto a normas de retención y promoción. Véase *Serbian Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696 (1976).

El sistema de instrucción propulsado por las iglesias lleva consigo la enseñanza de principios de ética y moral de la religión de que se trate que, en términos generales, están vedados como materia de instrucción en las escuelas del Estado por estar en pugna con el principio constitucional de separación de la Iglesia y del Estado. Por esta razón, las iglesias deben quedar en libertad de emplear y despedir a los miembros de su facultad sin que existan impedimentos extraños que menoscaben el libre disfrute de la libertad de culto. En sus relaciones con el Estado y sus agencias administrativas, las iglesias deben conservar, en lo que sea posible, la libertad de acción que le garantiza la Ley Fundamental.

En el caso de autos se trata exclusivamente de una querella que impugna el despido de maestros que trabajan en cierta escuela que ha establecido y opera en Puerto Rico la Iglesia Católica, Apostólica y Romana. A mi juicio, por tratarse de un problema de retención de profesores —que han de ser portadores de la doctrina religiosa que se enseña— la decisión de la jerarquía eclesiástica en cuanto a la conveniencia de conservar o de remplazar a los que han de impartir instrucción con un contenido religioso, debe estar bajo su estricto control. No veo diferencia alguna entre la determinación de prescindir de uno o más de los miembros del cuerpo de profe-

sores de una escuela religiosa y la decisión de la iglesia de cerrar una de sus escuelas, ante las objeciones de algunos de sus feligreses, puesto que esta decisión no está sujeta a escrutinio judicial ante los tribunales, según resolvimos recientemente en *Agostini Pascual* v. *Iglesia Católica*, 109 D.P.R. 172 (1979). Véase L. H. Tribe, *American Constitutional Law*, Mineola, N.Y., Foundation Press, 1978, pág. 839. Por tanto, tampoco debe estar sujeta al escrutinio de la Junta de Relaciones del Trabajo lo concerniente al empleo y despido de maestros de escuelas operadas por las iglesias.

Al menos en las circunstancias presentes en el caso de autos, estimo que la Constitución del Estado Libre Asociado de Puerto Rico impide la intervención de la Junta de Relaciones del Trabajo.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García a la cual se une el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 30 de junio de 1980

Al trazar las coordenadas de los importantes principios y derechos constitucionales que pugnan en este recurso, recordamos la admonición de nuestra Asamblea Constituyente de que "las convicciones religiosas tocan a lo más íntimo de la conciencia humana y la interferencia del poder político en este campo provoca legítima y hondas reacciones". [1] Las interrogantes noveles planteadas son: ¿tiene la Junta de Relaciones del Trabajo de Puerto Rico jurisdicción en ley [2] para intervenir y resolver una querella promovida por un grupo de maestros laicos de una escuela parroquial de la Iglesia Católica? De ser en el afirmativa, ¿conflige el ejercicio de dicha

---

[1] *Diario de Sesiones de la Convención Constituyente*, ed. 1961, T. IV, pág. 2563.

[2] Denominada Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130, de 8 de mayo de 1945, 29 L.P.R.A. sec. 61 *et seq.*

jurisdicción con los derechos dimanantes de las cláusulas religiosas consagradas en el Art. II, Sec. 3 de nuestra Constitución? Y, finalmente, ¿gozarán de primacía estos derechos sobre los de los maestros referentes a organizarse, negociar colectivamente e involucrarse en actividades concertadas según las Secs. 17 y 18 del mismo artículo?

I

La Iglesia Católica, Apostólica y Romana, haciendo negocios como Academia San Jorge, es una escuela elemental, intermedia y superior de orientación católica. En su contra un grupo de profesores formuló queja ante la Junta de Relaciones del Trabajo de Puerto Rico alegando despido ilegal por haberse dedicado a actividades concertadas con el único fin de ayudarse y protegerse mutuamente. Específicamente adujeron que la Academia intervino y los coerció en el ejercicio de sus derechos garantizados en los Arts. 4 y 8(a) de la Ley. Se expidió querella. La Academia negó tales hechos y en la afirmativa expuso que su actuación fue el no renovar los contratos de empleo, pero que satisfizo a los querellantes la totalidad de sus emolumentos.

Al iniciarse la vista del caso, la Academia levantó sin éxito la falta de jurisdicción de la Junta para intervenir. Oportunamente el Oficial Examinador rindió un extenso Informe a la Junta en el cual consideró probado los siguientes hechos: que para el curso escolar 1975–76, *el señor Arzobispo de la Iglesia Católica, Apostólica y Romana nombró al Padre Perfecto Pérez como Director de la Parroquia-Academia San Jorge*, cargo que ocupó durante el término 1976–77; que desde el primero de diciembre de 1975 se organizó *la Junta de Síndicos de la Academia, bajo la dirección del Padre Pérez; que el Padre Maysonet, su antecesor, nombró al Ing. Milton Castro como presidente de la Junta de Síndicos y le encomendó designar a los demás miembros;* que constituido dicho órgano, estuvo en funciones durante el curso escolar 1976–77, reu-

niéndose todos los lunes; que la Junta de Síndicos, entre otras cosas, velaba por las necesidades de la Academia en cuanto al mejoramiento y mantenimiento de su planta física, facilidades deportivas, administración de ingresos y egresos, contrataba los servicios necesarios para la construcción de facilidades, supervisaba y constataba la colecta de mensualidades y realizaba otros menesteres relativos a las cuentas administrativas y económicas de la Academia. Y la Junta de Síndicos no intervenía en los asuntos de la Parroquia San Jorge o en los de otras escuelas.

En cuanto a la organización y dinámica operacional de la Academia, consignó:

*El terreno y edificaciones donde ubicaba la Academia era propiedad de la Iglesia Católica y Apostólica Romana.* Era ésta la propiedad gravada en caso de hipotecas.

*El señor Arzobispo nombró al Padre Perfecto Pérez como Director de la Parroquia-Academia San Jorge.* No obstante el señor Arzobispo no intervenía en la administración u operación de la Academia. En una ocasión varios miembros de la Junta de Síndicos recurrieron al señor Arzobispo solicitándole su intervención en una controversia relativa a unas religiosas que ofrecían sus servicios en la Academia e interesaban participar en obras de caridad, pero aquel rehusó intervenir.

La parroquia y no la Academia enviaba regularmente una cantidad de dinero a la diócesis. La parroquia tenía una función religiosa mientras la de la Academia era educativa.

*Hubo ocasiones en que la parroquia San Jorge le hizo empréstitos a la Academia.* Este dinero era luego pagado a la parroquia de los ingresos de la escuela.

La Academia generó un superávit en muy pocos años.

Durante la incumbencia del Director Padre Maysonet, antecesor del Padre Perfecto Pérez, periódicamente se rendía un informe de ingresos y gastos a la diócesis de San Juan. El Vicario Episcopal de Administración tenía facultad para revisar estos informes del complejo Academia-Parroquia San Jorge a la oficina de la Superintendencia de Escuelas Católicas de Puerto Rico.

*El Superintendente de Escuelas Católicas de Puerto Rico tenía la función de estimular, coordinar y diseminar información*

*sobre buenas prácticas de enseñanza católica a los Principales y Administradores de las escuelas católicas de esta Isla, incluyendo la Academia.*

Había alrededor de cuarenta (40) maestros en la Academia durante el período 1976–77.

La contratación, despido, etc. del personal era asunto que competía exclusivamente a la Administración de la escuela. *La Directora y/o la Principal, en ciertas ocasiones con la confirmación del Director, reclutaban el personal de la Academia.* Este personal rendía servicios a la querellada solamente. Los fondos para pagar los sueldos de este personal era generado por las operaciones de la escuela.

La Academia tenía una cuenta corriente en el Banco Popular de Puerto Rico y era de ésta de donde se pagaba a los empleados siendo el Padre Pérez quien libraba los cheques. *En esta cuenta bancaria se incluía, además, los ingresos de la Parroquia San Jorge pero con una contabilización distinta.*

El costo de las mejoras (remodelaciones, ampliaciones, etc.) se pagaba, en parte, de un fondo de mejoras al cual contribuían los padres que matriculaban sus hijos allí. Se pagaba, además, del beneficio de actividades, tales como verbenas, auspiciadas por la querellada. Los pagos de préstamos —garantizados o no por hipoteca— se hacían de los fondos de la querellada.

La Administración podía incurrir en todo gasto necesario para la operación de la escuela, inclusive tomar dinero en calidad de préstamo sin la intervención de la diócesis hasta una cantidad de $10,000.00. Es decir, la diócesis no intervenía en las operaciones *excepto para actos que implicaran disposición o enajenación.* Por ejemplo, sólo la administración intervino en el desembolso de no menos de $15,000.00 para pagar a los querellantes el 16 de febrero de 1977. La diócesis sí intervenía cuando surgía la necesidad de tomar préstamos extraordinarios.

Sólo la Administración intervenía en la compra de artículos, tales como pupitres, escritorios, o aquellos servicios necesarios para la operación.

La Academia, sin intervención alguna, administraba una tienda de libros y efectos escolares.

El volumen de negocios de la Academia fue de $486,000.00.

Finalmente, el examinador concluyó que el 16 de febrero de 1977 los querellantes fueron despedidos por haberse dedi-

cado a actividades concertadas de protección y ayuda mutua tendentes a lograr el pago en forma quincenal, hacia la seguridad, la permanencia en sus puestos y otros beneficios. Recomendó que la Junta ordenara a la Academia el cese y desista, la reposición de los empleados y que fijara en sitios conspicuos la orden emitida.

Así las cosas, la Junta declaró sin lugar la defensa de falta de jurisdicción. Por vía de excepción, y en consideración a los planteamientos constitucionales, acordamos revisar en dicha etapa la decisión y sus consecuencias.

## II

La Academia esencialmente argumenta "que los hechos del presente caso caen claramente dentro del ámbito de lo expresado en el caso de [*NLRB* v. *Catholic Bishop of Chicago*, 440 U.S. 490 (1979)]. Lo que pretende la Junta reglamentar en el caso que nos ocupa es la relación directa entre una escuela parroquial controlada por la Iglesia y los profesores que laboran para esa institución. La intervención de la Junta significaría una clara violación a las cláusulas de religión según éstas quedan expresadas en la primera enmienda de la Constitución. Como bien se dijo en el caso de [*Serbian Orthodox Diocese*] v. *Milivojevich*, 426 U.S. 696 (1976), las decisiones de las autoridades religiosas en materia de disciplina, fe, organización interna no son susceptibles de revisión por los Tribunales de Justicia. Los hechos aquí apuntados demuestran claramente que la Junta se excedió al declararse con jurisdicción no empece a lo resuelto en el caso de *Catholic Bishop of Chicago*, supra. Es por esta razón que respetuosamente solicitamos de este Honorable Tribunal deje sin efecto la resolución de la Junta de Relaciones del Trabajo de fecha 11 de junio de 1979 y proceda a desestimar la querella radicada".

En *oposición*, la Junta aduce que los casos invocados por la Academia no rigen el de autos; que su actuación "está

enmarcada en el ejercicio válido de su facultad, conforme ésta emana de las disposiciones de su Ley Orgánica, y en el cumplimiento cabal de las mismas para efectuar los propósitos de la Ley". Y añade:

Siendo los propósitos de la Ley darle contenido real a la política pública obrero-patronal de conformidad con los preceptos constitucionales que garantizan los derechos de los patronos y de los trabajadores. En manera alguna puede sostenerse la contención de la recurrente en el sentido de que "Lo que pretende la Junta reglamentar en el caso que nos ocupa es la relación directa entre una escuela parroquial controlada por la Iglesia y los profesores que laboran para esa institución." Así como tampoco surge del récord ni éste sugiere interpretación demostrativa de interferencia con las disposiciones constitucionales de separación de Iglesia y Estado ni con aquellas que garantizan el libre ejercicio del culto religioso.

No es correcto el postulado de la Academia San Jorge en el sentido de que *Catholic Bishop,* supra *obliga* a la Junta recurrida a desestimar la querella en el caso en autos. Lo único que allí se decide, es que la Ley Nacional de Relaciones del Trabajo no incluye en la cobertura de su jurisdicción a los maestros envueltos dentro de la situación de hechos que allí el Tribunal examinó. Por el contrario en el caso en autos la jurisdicción de la Junta recurrida es clara, emanando de nuestro estatuto, la Ley de Relaciones del Trabajo de Puerto Rico y de las disposiciones constitucionales antes señaladas. Reiteramos, que a diferencia de la jurisdicción federal, en nuestra jurisdicción el derecho de los trabajadores a la negociación colectiva y a dedicarse a actividades concertadas legales para lograr mejores condiciones de trabajo tiene rango constitucional.

Por su parte, los maestros querellantes recurridos, en síntesis, enarbolan la estirpe constitucional de los anteriores derechos, destacando que "[e]l propósito de la Ley de Relaciones del Trabajo es promover la paz industrial, asegurar la producción ininterrumpida de artículos y servicios, y mejorar las condiciones económicas de los empleados. Es, pues, totalmente secular en su propósito.

La Junta no tiene que pasar sobre cuestiones esencialmente de fe; ni sobre requisitos de catolicidad genuinos y/o excelencia académica requeridos por cuerpo religioso alguno. Los abogados de la querellada-recurrente no han traído tan siquiera la más mínima prueba de carácter sustancialmente religioso de las escuelas parroquiales. Tampoco han traído prueba de que 'la rescisión del contrato de los profesores es un asunto interno de la jerarquía eclesiástica por entenderse por éstos que la labor de estos profesores no era conducente al fin de catolicidad que este colegio persigue'. La querellada-recurrente tampoco alega que las actividades concertadas de los profesores atentan contra los estándares de catolicidad genuina".

### III

Con estos antecedentes presentes, analicemos la controversia sobre la jurisdicción de la Junta local desde el punto de vista de cubierta estatutaria.

En este cometido, primeramente es menester reseñar la decisión del Tribunal Supremo federal emitida en *NLRB* v. *Catholic Bishop of Chicago*, 440 U.S. 490 (1979), por razón de la discusión, alcance y contenido ilustrativo que desarrollan las partes. Veamos.

Unas uniones presentaron ante la Junta Nacional de Relaciones del Trabajo peticiones para representar a los maestros laicos de diferentes escuelas operadas por instituciones religiosas donde se ofrecía enseñanza seglar y religiosa. Las escuelas cuestionaron la jurisdicción alegando que la Junta carecía de discreción en ley para reglamentarlas y estaba impedida en virtud de las cláusulas religiosas de la primera enmienda. La Junta rechazó tales argumentos aplicando como medida (*test*) su criterio diferencial de si las escuelas eran "completamente religiosas" o sólo "asociadas a la religión". Convencida de que las escuelas no caían en la categoría de "completamente religiosas", asumió jurisdicción y ordenó elecciones. Como resultado, las uniones obtuvieron represen-

tación. Las escuelas se negaron a negociar y las uniones presentaron ante la Junta cargos de práctica ilícita. Nuevamente, sin éxito, las escuelas reprodujeron sus planteamientos. Entonces acudieron al tribunal de apelaciones (7mo Circuito), cuyo foro les dio la razón y se negó a poner en vigor la orden de la Junta. Resolvió que ésta no ejerció su discreción debidamente y que su guía para distinguir entre escuelas "completamente religiosas" y "asociadas a la religión" era insuficiente y simplista y podría significar una indebida extensión de su jurisdicción a todas las escuelas operadas por instituciones religiosas. Por ende, entró a examinar su constitucionalidad, decidiendo que tanto la cláusula de libertad de culto como la de establecimiento impedían que la Junta ejerciera jurisdicción, ya que en algún punto la investigación de los hechos por la agencia o los tribunales levantaría serias cuestiones protegidas por la primera enmienda tocantes a la libertad de las autoridades eclesiásticas para organizar y dirigir la enseñanza en consonancia con los requerimientos de su religión.

No conforme la Junta, apeló. El Tribunal Supremo federal confirmó al Circuito, por voz de su Presidente, el señor Burger, al resolver que la Ley Federal de Relaciones del Trabajo (National Labor Relations Act) no incluía en su definición de "patrono" a las iglesias operadas como escuelas. En consonancia con la doctrina de evitar pasar juicio sobre cuestiones constitucionales mientras un estatuto pudiera ser interpretado en armonía con la Constitución, analizó los posibles conflictos que acarrearía el ejercicio de jurisdicción por parte de la Junta sobre tales escuelas. Hizo la salvedad de que no estaban prejuzgando los planteamientos de inconstitucionalidad en los méritos. El Juez Señor Brennan, en opinión disidente en la que concurrieron tres jueces, concluyó, en contrario, que el estatuto cubría tales escuelas. Se basó en la definición de "patrono" contenida en la ley, la cual tenía pocas exclusiones *expresas* y no estaban entre ellas las

iglesias. Se abstuvo de considerar los méritos de la cuestión constitucional planteada "debido a que la mayoría tampoco lo hizo".

Con posterioridad, a la luz de esta decisión, la Junta Nacional ha resuelto que el ejercicio de su jurisdicción sobre maestros laicos en escuelas parroquiales no está permitido. *Grutka, Bishop of Gary*, 243 NLRB No. 2, 101 LRRM 1349 (1979). Sin embargo, no ha rendido totalmente su jurisdicción, pues ha expresado su intención de estimar el término "operada por la iglesia" (*church operated*) restrictivamente, diferenciándolo de las escuelas "afiliadas a la iglesia" (*church affiliated*). Por ende, ejercita su poder sobre estas últimas si están dirigidas por una junta de síndicos sobre la cual la diócesis no nombra ningún miembro ni ejerce control o influencia en sus operaciones. *Roman Catholic Diocese of Brooklyn*, 243 NLRB No. 24, 101 LRRM 1436 (1979). Aunque está en su etapa embrionaria, de la lectura de dichos casos estimamos relevantes varios criterios para diferenciar los conceptos de "operadas" y "afiliadas": (a) si se trata de una institución de estudios post graduados o universitarios, ya que por tradición y edades se reconoce que en las escuelas parroquiales a niveles elemental, intermedio y superior existe y es más susceptible la indoctrinación religiosa; (b) si se requiere o no instrucción o cursos de religión católica; (c) si se observan, en el calendario escolar, días feriados religiosos; (d) si en la contratación de los maestros laicos es determinante y se hace formar parte del contrato el carácter y la orientación religiosa de la escuela; (e) si existe o no dependencia del Obispo; (f) si hay vínculo con la diócesis a través de la junta de síndicos; (g) si los terrenos donde ubica la escuela pertenecen a la iglesia; y (h) si las operaciones económicas de la escuela y la parroquia, aunque separadas, pueden ser objeto de algún control o intercambio recíproco o por la diócesis. *College of Notre Dame*, 245 NLRB No. 44 (1979), 1979–80 CCH NLRB, ¶ 16, 318.

En Puerto Rico, de todos es conocido que los derechos fundamentales de los trabajadores, garantizados en las Secs. 17 y 18 del Art. II de la Constitución del Estado Libre Asociado, se implementan a través de la Ley de Relaciones del Trabajo de Puerto Rico, creadora del foro administrativo cuasi-judicial denominado Junta de Relaciones del Trabajo. Su función primordial es prevenir prácticas ilícitas en el dinámico campo de las relaciones obrero-patronales. Su cubierta y acción jurisdiccional se mide tomando en cuenta las amplias definiciones de los términos "patrono" y "empleado". (³)

A tenor de lo expuesto, en *Junta Rel. Trabajo* v. *Club Deportivo*, 84 D.P.R. 515, 523 (1962), sentamos el siguiente enfoque doctrinario:

El término "patrono" contenido en leyes de esta índole no debe ser interpretado en forma tal que se frustren los propósitos de la ley. . . . La amplitud de la definición es señal inequívoca de la intención de que en casos de duda debe preferirse una interpretación que sea compatible con la realidad económica que se tiende a mejorar en lugar de limitarla a los conceptos tradicionales de la definición de "patrono" . . . . No puede ignorarse el propósito claro que informa la medida legislativa tendente a mejorar las condiciones económicas de las clases más necesitadas y las circunstancias que rodean la relación obrero-patronal que particularmente se considera . . . .

---

(³) "El término 'patrono' incluirá ejecutivos, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente, pero no incluirá excepto en el caso de las instrumentalidades corporativas del Gobierno de Puerto Rico como más adelante se definen, al Gobierno ni a ninguna subdivisión política del mismo; Disponiéndose, que incluirá, además, a todo individuo, sociedad u organización que intervenga a favor de la parte patronal en cualquier disputa obrera o negociación colectiva." 29 L.P.R.A. sec. 63(2). "El término 'empleado' incluirá a cualquier empleado, y no se limitará a los empleados de un patrono en particular, a menos que la Ley explícitamente lo exprese en contrario, e incluirá a cualquier individuo cuyo trabajo haya cesado como consecuencia de, o en relación con cualquier disputa obrera, o debido a cualquier práctica ilícita de trabajo, pero no incluirá a ningún individuo empleado en el servicio doméstico en el hogar de cualquier familia o persona ni a ningún individuo empleado por sus padres o cónyuge." 29 L.P.R.A. sec. 63(3).

*Las definiciones de nuestra ley son lo suficientemente amplias para comprender entre los patronos sujetos a sus disposiciones a asociaciones sin beneficio pecuniario* aun cuando no se dediquen a actividades industriales o para la producción . . . . No debe olvidarse que esta medida . . . forma parte de una serie de leyes cuyo fin inmediato es proteger adecuadamente a los obreros en sus relaciones con el patrono, y especialmente enderezadas a mejorar sus condiciones de vida y trabajo. (Citas omitidas.) (Énfasis nuestro.)

Tomando aisladamente el estatuto, a tono con la regla de hermenéutica apuntada y sin evaluar en esta etapa los planteamientos constitucionales más adelante expuestos, consideramos razonable sostener que los maestros laicos recurridos, técnicamente *no* están expresamente exentos de la jurisdicción de la Junta. En consecuencia, la contestación a la primera interrogante formulada al inicio de esta ponencia es en la afirmativa.

## IV

El Art. II, Sec. 3 de nuestra Constitución, al preceptuar que "[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso [y h]abrá completa separación de la iglesia y el estado. '. . . recoge lo dispuesto en la primera enmienda de la Constitución federal sobre la libertad de cultos y prohibición de establecer religión oficial alguna. Añade además el principio de que habrá completa separación de la Iglesia y el Estado. Estas tres disposiciones tienen un vasto contenido histórico. Por sí solas servirían tal vez para orientar el desarrollo constitucional en lo que se refiere a las demarcaciones fijadas para la convivencia en paz, tolerancia, respeto recíproco y autonomía espiritual en un terreno en donde por muchos siglos han germinado los mayores conflictos y las más vehementes recriminaciones' ". *Diario de Sesiones, op. cit.*, pág. 2563.

Recientemente rechazamos una interpretación absolutista de la cláusula de separación de Iglesia y Estado. Conscientes de que las zonas de acción de ambos poderes suelen entremezclarse y no existiendo "un interés secular de suficiente peso para permitir la intervención del poder judicial", nos negamos a revisar la decisión de la Iglesia Católica, Diócesis de Ponce, de cerrar una escuela superior parroquial. Al exponer los fundamentos en apoyo de nuestro dictamen hicimos énfasis en la visión de la Carta Pastoral sobre educación de que "[l]a escuela católica debe caracterizarse por dos notas esenciales: *excelencia académica y catolicidad genuina*". *Agostini Pascual* v. *Iglesia Católica*, 109 D.P.R. 172 (1979).

En el caso de autos, para evaluar en toda su amplitud el impacto, si alguno, que el ejercicio de la jurisdicción por la Junta tendría sobre la Academia recurrente, es menester unos comentarios sobre la concepción de la educación religiosa en las escuelas parroquiales, y con relación a su organización y la importancia que a los maestros se les otorga. (4)

A manera de introito, cabe señalar que desde el punto de vista filosófico y jurídico se parte de la premisa de que existe un derecho absoluto e incuestionable de defender los principios religiosos que inspiran el derecho divino de cada religión. La cuestión ha sido así resumida:

Las colectividades de personas que profesan un mismo *credo* o sistema de ideas sobre aquellas verdades absolutas que explican el destino último del hombre y, en consecuencia, justifican sus actos, tienen una influencia decisiva, son las que dicen la última palabra, en materia de *educación*. Inmanencia y trascendencia, polarizadas a lo largo de la Historia en sus versiones más categóricas, que son respectivamente el paganismo panteísta y el monoteísmo personal y trascendente —cuya formulación más

---

(4) Es profusa la literatura sobre la personalidad del educador. M. Cerna, *La Personalidad del Maestro*, México, Ed. Oasis, S.A., 2da ed., 1973, pág. 103; A. Nieto Caballero, *Los Maestros*, Bogotá, Colombia, 1963; C. Colegrove, *The Teacher and the School*, Chicago, Charles Scribner's Sons, 1922, págs. 71–81. L. Luzuriaga, *La Pedagogía Contemporánea*, Buenos Aires, Ed. Losada, S.A., 1943, págs. 26–31.

acabada, concluyente y universal es, a su vez, la del catolicismo apostólico romano— constituyen en definitiva las dos colosales fuerzas centrípetas que operan sobre las conciencias individuales. Las restantes soluciones propuestas, prácticamente infinitas, desde el racionalismo puro hasta la utopía —eclecticismos, relativismos, sincretismos . . . y "un largo etcétera"— son tesituras, inclinadas, más o menos explícita o larvadamente, hacia uno de aquellos dos polos. Valdés y Menéndez, *La Educación ante el Derecho*, LXXVII Rev. G. de Leg. y Juris. 261, 302–303 (Sept. 1978).

Varias encíclicas recogen la posición doctrinaria de la Iglesia Católica. *"Divini illius Magistri"*, año 1930, declara que "[e]s necesario que toda enseñanza y toda la organización de la escuela: *maestros*, programas y libros, en cada disciplina, *estén imbuidos de espíritu cristiano bajo la dirección y vigilancia Materna de la Iglesia,* de suerte que la religión sea verdaderamente fundamento y corona de toda la instrucción, en todos los grados, no sólo en el elemental, sino también en el medio y superior". (Énfasis nuestro.) *Gravissimum Educationis* caracteriza la educación como parte del mandato evangelizador, "recibido de su divino Fundador de anunciar a todos los hombres el misterio de la salvación y de instaurar todas las cosas en Cristo". Vaticano II, Santander, España, Ed. Sol Terrae, 1966, pág. 318. Sobre las escuelas católicas expresa:

La presencia de la Iglesia en el campo de la enseñanza se manifiesta de un modo particular por la escuela católica; ella, no menos que las otras escuelas, persigue fines culturales y la formación humana de la juventud. A ella pertenece formar un clima en la comunidad escolar informado del espíritu evangélico de libertad y caridad, ayudar a los jóvenes a fin de que en el desarrollo de la propia personalidad crezcan, a la vez, según la nueva criatura que por el bautismo han sido constituidos, y ordenar toda la cultura humana en último término al mensaje de la salvación, de tal modo que el conocimiento alcanzado gradualmente por los alumnos sobre el mundo, la vida y el hombre, vaya iluminado por la fe. Así pues, la escuela católica

abriéndose, como es conveniente, a las características del progreso actual, educará a sus alumnos en el servicio eficaz del bien de la ciudad terrestre y les preparará para el trabajo de extender el reino de Dios, de modo que sean para la comunidad humana como un fermento saludable con el ejercicio de una vida ejemplar y apostólica.

*Siendo la escuela católica tan útil para cumplir la misión del Pueblo de Dios y para el diálogo entre la Iglesia y la comunidad humana, en mutuo beneficio de ambas, conserva en nuestros días toda su importancia. Por lo cual este Santo Concilio proclama de nuevo el derecho de la Iglesia a fundar y dirigir libremente escuelas de todo orden y grados, como ya está declarado en muchos documentos del Magisterio, recordando que el ejercicio de este derecho es sumamente útil a la libertad de la conciencia, a la defensa de los derechos de los padres y también al progreso de la misma cultura.* Págs. 324–325. (Énfasis nuestro.)

Desde esta perspectiva se pone de manifiesto la figura clave del maestro laico: para la Iglesia Católica, el "educador cristiano desempeña una misión humana y evangelizadora. *Las instituciones educativas de la Iglesia reciben un mandato apostólico de la Jerarquía*". A tal efecto, la más reciente orientación doctrinaria promulgada en Puebla, Méjico, hace un llamado para "promover al educador cristiano, especialmente laico, para que asuma su pertenencia y ubicación en la Iglesia, como llamado a participar de su misión evangelizadora en el campo de la educación". III *Conferencia General del Episcopado Latinoamericano Puebla: La Evangelización en el Presente y en el Futuro de América Latina* (Ed. L. Casal y Asoc.), Bogotá, Colombia, 1979, págs. 220–221.

En Puerto Rico, la filosofía de la escuela católica sigue esencial y rigurosamente la doctrina expuesta, que "[. . . s]upone una comunidad escolar y [. . . t]iene unos objetivos particulares bien definidos: 1. [c]rear un ambiente animado por el espíritu evangélico de libertad y de caridad; 2. [a]yudar a los alumnos: en el desarrollo de su propia persona, a crecer según la nueva criatura, preparándolos para que todo su quehacer humano esté iluminado por la fe". *Carta Pastoral*

*sobre la Educación en las Escuelas Católicas de Puerto Rico* (adoptada por la Conferencia Episcopal de Puerto Rico en 30 de marzo de 1976) (mimeografiada), pág. 4.

En torno a la línea de autoridad y organización, esta Carta Pastoral describe al *director* como:

. . . *el representante del Obispo* y el responsable inmediato de que la escuela católica logre sus objetivos, sobre todo, su fidelidad a esta filosofía educativa. Es el Pastor de la comunidad escolar y procurará hacer de ésta una auténtica comunidad de fe. El Director es el primer promotor y animador de la comunidad escolar, *a través del cual, la comunidad escolar entra en comunión con el Obispo* y se integra a la Pastoral Diocesana bajo la supervisión del Superintendente de las escuelas católicas. De ahí la necesidad de mantenerse en continua comunicación con el referido Superintendente. El Director debe ser persona muy comunicativa, muy dada al diálogo y comprensivo. Tiene que ser persona de gran visión, de mucha apertura al cambio, competente y creador. *Le corresponde, también, la administración económica y otros asuntos de carácter general determinados por el Superintendente de las escuelas católicas.* (Énfasis nuestro.)

Sobre el *principal:*

El Principal es la persona que, en la más estricta coordinación con el Director, *ejecuta la filosofía educativa de la institución.* En ausencia del Director es la persona que asume la responsabilidad total de la escuela. Por consiguiente, es necesario que conozca bien, acepte en su totalidad, promueva y haga realidad esta filosofía.

Y sobre el *maestro:*

*El maestro, por ser el miembro de la comunidad escolar que está en relación directa con el componente más importante de la escuela católica que es el alumno, es una persona clave en nuestro sistema. De ahí la gran necesidad de que conozca, comprenda y viva nuestra filosofía educativa.*

El mundo en el que vivimos y los objetivos que hemos propuesto para las escuelas católicas, piden tres cosas de nuestros maestros:

1) *vocación:* los conceptos de misión y servicio y los sacrificios envueltos hacen del magisterio más que una profesión, un arte; *es una llamada a una vida apostólica: educar a la luz de los valores evangélicos.*

2) *preparación académica:* la excelencia académica exige que sea competente; en nuestro sistema educativo esto significa que tengan los debidos títulos y certificados además de la dedicación y destrezas que exige su vocación.

3) *formación religiosa:* nos parece obvio que la misión confiada al maestro y *el objetivo de catolicidad genuina exigen de él una profunda formación religiosa y una auténtica vida cristiana.*

Respecto a la preparación académica de los maestros, deseamos señalar que los responsables de las escuelas deben ser de gran ayuda en el perfeccionamiento de aquellos miembros de la facultad, los cuales, no obstante su posesión de títulos y certificados, sienten la necesidad de renovarse.

Recomendamos a los superintendentes, directores y principales que ofrezcan a los maestros oportunidades de mejoramiento, tales como adiestramiento simultáneo en el servicio, seminarios y talleres, en los que se podrán familiarizar con técnicas modernas de pedagogía *y con el pensamiento de la Iglesia.*

Recomendamos, también, a los maestros que estén disponibles a la renovación y adaptación y que aprovechen las oportunidades de mejoramiento que se les ofrecen.

*El principal propósito de la escuela católica es transmitir el mensaje evangélico y fomentar la vida cristiana, por lo tanto, la asignatura más importante del currículo de la escuela católica es la religión.* (Énfasis nuestro.)

En síntesis, desde el prisma de la Iglesia Católica resulta incuestionable que la "docencia solo puede tener como objetivo la verdad, tanto la natural como la sobrenatural, que todo hombre está moralmente obligado a buscar y a abrazar y practicar una vez conocida. La educación, en materia de *fe* y *costumbres,* corresponde de manera preeminente a la Iglesia, en virtud del mandato de su divino Fundador, Jesucristo —*Docete omnes gentes*— . . .". Valdés y Menéndez, *op. cit.,* pág. 308. Este encomienda la ejecuta el Obispo a través de los directores, principales y maestros, tanto religiosos como laicos,

de las escuelas parroquiales, los cuales deben como fin esencial transmitir y enfatizar el mensaje cristiano en todos los órdenes de la vida. (⁵) En este sentido, fácil es advertir que la actividad educacional de las escuelas católicas, por tradición y doctrina, se funda en y forma parte integrante de una práctica eminentemente religiosa que tiene su génesis en un mandamiento de Cristo. Sus protagonistas principales, a saber, director, principal y maestros, desempeñan la encomienda de los jerarcas eclesiásticos dentro de la cual han de desenvolverse.

## V

El problema de la libertad religiosa en el campo obrero-patronal, aunque de nuevo cuño en Puerto Rico, ha sido objeto de intenso debate en los Estados Unidos. Hasta que el Supremo federal resolvió finalmente *Catholic Bishop of Chicago*, supra, generó frondosos análisis. (⁶) Es de esperarse que continúen.

El escrutinio judicial en estas cuestiones exige una evaluación tripartita para detectar si la acción gubernamental (1) posee un *propósito* secular; (2) contiene un *efecto* secular que no promueve o inhibe la religión; y (3) conlleva o no una

---

(⁵) Para una crítica al respecto, véase: Reyes, *La Educación Laica*, Montevideo, Ed. Claudio García y Cía., 1946.

(⁶) *Bureaucratic Governmental Regulation of Churches and Church Institutions*, 21, No. 2 Journal of Church and State 195, 201–205 (1979); Bastress, *Government Regulation and the First Amendment Religious Clauses—An Analysis of the NLRB Jurisdiction Over Parochial Schools and Their Teachers*, 17, No. 2 Duquesne L. Rev. 291 *et seq.* (1978–79); Warner, *NLRB Jurisdiction Over Parochial Schools: Catholic Bishops of Chicago v. NLRB*, 74 Nw. U.L. Rev. 463 (1978); Curiale, *NLRB Jurisdiction Over Religious Schools and the Religion Clause of the First Amendment*, 24, No. 1 Catholic Law. 77 (1978); Kryvoruka, *The Church, the State and the National Labor Relations Act: Collective Bargaining in the Parochial Schools*, 20 William & Mary L. Rev. 33 (1978); Comments: *The Free Exercise Clause, The NLRB and the Parochial Schools Teachers*, 126, No. 3 U. Pa. L. Rev. 63 (1978); Fitzgerald, *Origin and Impact of Government Regulations*, 24, No. 3 Catholic Law. 236 (1979); Mott & Edelstein, *Church, State and Education, The Supreme Court and its Critics*, 2 J.L. & Educ. 535, 549 (1978).

*intervención excesiva* administrativa en los asuntos religiosos. *Committee For Public Education* v. *Regan*, 444 U.S. 646 (1980) ; *Meek* v. *Pittenger*, 421 U.S. 349, 358 (1975). Se reconoce lo difícil de aplicar estas medidas ya que existe "un antagonismo natural entre el mandato de no establecer religión oficial y el de no inhibir su práctica. Esta tensión entre cláusulas, muchas veces obliga al Tribunal a escoger en los casos religiosos entre dos valores competitivos. La guía general es el concepto de 'neutralidad'. Los valores opuestos requieren que el gobierno actúe para alcanzar sólo fines seculares, y que lo logre de manera religiosamente neutral. Lamentablemente, surgen situaciones en que el gobierno no tiene otra alternativa que incidentalmente ayudar u oponerse a grupos o prácticas religiosas". Nowak, Rotunda & Young, *Handbook on Constitutional Law*, 848 (1978). En su reputada obra *American Constitutional Law*, el Profesor Tribe explica las dimensiones constitucionales de los requisitos aludidos.

Sobre el primer requisito —propósito secular— nos dice: "Lo más fundamental en un sistema constitucional diseñado para lograr autonomía religiosa es que la acción gubernamental pueda por lo menos justificarse en términos seculares. Aquellas acciones que no son así justificables, típicamente infringen la cláusula de establecimiento y, en la medida en que limitan la libertad de acción sobre credo, violan también la cláusula sobre libre ejercicio". *Op. cit.*, pág. 835.

En torno al segundo requisito, —el efecto secular— consigna Tribe que "[a]un cuando no pueda demostrarse que la política gubernamental estaba *dirigida* al aspecto relativo al comportamiento religioso, si esencialmente el *efecto* de la acción gubernamental es influir —positiva o negativamente— el logro de una tradición religiosa o la expresión de una creencia religiosa, debe entonces anularse en cuanto violenta la cláusula sobre libertad de culto, si su efecto es negativo, o por infringir la cláusula sobre establecimiento oficial de religión, si su efecto es positivo". *Op. cit.*, pág. 839.

Y, finalmente, respecto al requisito de que la acción del Estado no implique una indebida intromisión en los asuntos religiosos, nos señala: "Lo que es necesario para preservar la integridad de la religión y el gobierno varía de contexto a contexto. Ciertamente los tribunales norteamericanos *no* requieren —ni siquiera permiten— que el gobierno sea totalmente ajeno a la religión . . . ." pág. 866. "Lo que la separación de la iglesia y el estado requiere, por lo tanto, es evitar que se 'involucren directamente las instituciones seglares y religiosas, ya que es la entremezcla excesiva gubernamental con la religión lo que realmente amenaza tanto a la libertad privada como al orden público . . .'." La Corte ha estado particularmente preocupada por evitar (1) "una evaluación gubernamental sustantiva de la práctica religiosa", (2) "una investigación gubernamental extensa de las operaciones de la iglesia y sus finanzas" y (3) "una ingerencia del gobierno en las difíciles clasificaciones de qué es religioso o no". *Op. cit.*

El carácter y propósito religioso de las escuelas parroquiales católicas es un hecho aceptado en los Estados Unidos, donde se "ha reconocido la función crítica y única del maestro" en su operación. *NLRB* v. *Catholic Bishop*, supra. Citando a *Lemon* v. *Kurtzman*, 403 U.S. 602, 617 (1971), se destaca que "[l]a Autoridad religiosa necesariamente permea todo el sistema escolar". En su opinión concurrente, en *Lemon*, el extinto Juez Señor Douglas nos advertía del "hecho obvio y admitido de que la raison d'être de las escuelas parroquiales es la propagación de una fe religiosa". Pág. 628.

En el caso que nos ocupa, la evidencia desfilada ante el oficial examinador corrobora el carácter y motivo dual religioso-educativo de la Academia San Jorge. También ilustra el vínculo económico, directo e indirecto, y de otras índoles, que unen dicha institución con la más alta jerarquía, el Arzobispado, que ejerce una supervisión a través de: (1) las personas que selecciona para los puestos directivos administrativos —director y principal—; y (2) su superintendencia.

Éstos, a su vez, implementan los objetivos básicos. La designación unilateral o a propuesta de los miembros de la junta de directores permite un control efectivo sobre la ordenación de labores administrativas de la escuela. Esto surge de la carta pastoral antes aludida:

La escuela católica tiene que cumplir dos funciones principales para merecer el nombre de tal: la de escuela y la de católica. Como escuela deberá ser un centro de enseñanza donde se pone en práctica la filosofía educativa que venimos exponiendo. En lo académico, tiene por objeto el desarrollo de las habilidades personales, el crecimiento de la personalidad y la motivación intelectual. Como católica, deberá ser una verdadera comunidad de fe. Una comunidad con las características de la comunidad de hoy y animada por el espíritu cristiano expuesto en esta filosofía educativa. Pág. 9.

En vista de la naturaleza y los objetivos educativos religiosos de la Academia San Jorge, concluimos que es legítimo y serio el reclamo que dicha institución opone en virtud de las cláusulas religiosas, contra la intervención de la Junta. Ello obliga a considerar las áreas conflictivas y las posibles tensiones constitucionales que genera tal intromisión. En *Lemon*, supra, el Juez Señor Brennan consignó:

. . . todos los variados aspectos del programa de escuelas parroquiales —el carácter de su facultad, su supervisión, su decorado, programas, actividades extracurriculares, reuniones, cursos, etc.— producen una "atmósfera religiosa e intangible", ya que el "sistema de escuelas diocesano es parte integral de la misión religiosa de la Iglesia Católica" y "un vehículo poderoso para transmitir la fe católica a la próxima generación." [Cita omitida.] La calidad en materia de enseñanza secular es parte integrante de esta empresa religiosa. "Una buena enseñanza secular es tan esencial a la misión religiosa de las escuelas parroquiales como el techo de la institución o los pupitres de los salones de clase". [Cita omitida.] Que la enseñanza no puede separarse del ambiente en que se presta, ya que su integración con los propósitos religiosos es, conjuntamente, la teoría y fortaleza de las escuelas religiosas. Pág. 657.

De ordinario, la participación de la Junta produce unos cambios y efectos limitativos sobre todo patrono, los cuales comprenden desde el aspecto económico o fiscal hasta las relaciones entre la iglesia y los maestros, esto es, la fase de control general y administrativo. Examinémoslos con referencia al caso de autos.

La cubierta y aplicación de la Junta aumentaría el poder persuasivo y de regateo (*bargaining power*) de los maestros laicos empleados, lo que a su vez directamente ampliaría los gastos de nómina de la escuela por razón de un incremento en los salarios. Hasta aquí, el argumento no sería convincente. Ahora bien, cabe notar que nuestra preocupación no descansa en la solvencia económica de estas escuelas, sino en que este factor es un eslabón importante en la cadena de efectos, pues se acrecentarían los costos como resultado del aparato administrativo de negociación colectiva que habría que crear y aquellos gastos legales inherentes que surgen en el proceso. Y entonces, es razonable esperar un aumento en las matrículas para absorber tales costos, lo que tendría unos *efectos inhibitorios sobre el derecho constitucional de determinados padres a lograr la educación integral cívico-religiosa deseada en tales escuelas y se produciría un agravamiento en la solvencia económica de las mismas y un círculo vicioso que podría llevar al cierre de estas instituciones.* (⁷) Estos efectos inhibitorios en los padres que desean matricular y educar a sus hijos en escuelas de inspiración religiosa son los que han

---

(⁷) En los Estados Unidos existe una similitud entre los problemas económicos que afligen a las escuelas públicas y las privadas. Boles, *Persistent Problems of Church, State and Education*, 1 J. of L. & Educ. 601, 605 (1972). Este fenómeno es transportable a las realidades del Puerto Rico contemporáneo.

*Braunfeld* v. *Brown*, 366 U.S. 599 (1961), *no* gira sobre un caso en que esté envuelta una escuela religiosa, sino sobre una ley que prohíbe la venta de mercancía al detal los domingos. Un grupo de comerciantes, cuya fe les impedía dedicarse al comercio desde el viernes al sábado y lo hacían entonces el domingo, cuestionan la ley sin éxito. *Braunfeld*, a nuestro juicio, resuelve que el criterio pecuniario, si bien no es absoluto, no puede descartarse.

preocupado a las autoridades judiciales y a los estudiosos de esta problemática. El aumento de matrículas por acciones del Estado de esta índole, tiende a chocar con el derecho constitucional reconocido de educar a los hijos en escuelas privadas distintas a las del Estado. Estamos conscientes de la proposición que intenta inyectar una interrogante de crasa violación a la separación de Iglesia y Estado a base de un alegado tratamiento preferente de las escuelas privadas religiosas frente a las que no lo son. El argumento es más aparente que real. Entre las escuelas privadas sin afiliaciones religiosas, sufran o no mal económico, existe una notable y significativa diferencia: la existencia de unas cláusulas religiosas que amparan a las últimas. Ello elimina toda posible especulación en torno al argumento sobre trato preferente.

Cabe preguntarnos, ¿cómo puede el Estado lícitamente negar *toda* clase de ayuda económica a la educación en las escuelas parroquiales católicas, y a la vez sujetarlas a una reglamentación gubernamental costosa, onerosa e intrincada? En la opinión del Juez Señor Pell del Séptimo Circuito en *Catholic Bishop of Chicago* v. *N.L.R.B.*, 559 F.2d 1112, 1119 (1977), "se entiende mejor la queja de los patronos, de que la Junta está cortando a latigazos sus escuelas resolviendo que tales instituciones son demasiado religiosas para recibir asistencia gubernamental pero que no son lo suficientemente religiosas como para ser excluidas de su reglamentación". Claramente, de intervenir la Junta, las escuelas parroquiales experimentarán unas relaciones diferentes con sus maestros.

En Puerto Rico, al igual que en los Estados Unidos, "tales escuelas perder[ía]n casi toda habilidad para negociar con sus empleados individualmente; con el respaldo de la Junta, las uniones lograr[ía]n cláusulas sobre promociones, causas por cesantía y otros elementos de importancia. Los unionados [tendrían] derecho a ser representados por oficiales de la unión durante las reuniones y sesiones discipli-

narias con los patronos. La Unión es un amortiguador constante entre la escuela y los empleados. Resultará una relación más adversativa". Bastress, *op. cit.*, págs. 319–320. No albergamos dudas de que esta situación disminuiría notablemente el ejercicio del poder del Obispo sobre tales escuelas. "Nunca más sería . . . el único depositario de la autoridad, según requerido por la ley eclesiástica. Canon 1381. Tal como lo reconoce la Junta, el Obispo tiene ahora que compartir 'algunas decisiones' con la Unión y, como cuestión de práctica, debe ahora consultar con los representantes de la facultad laica sobre todos los asuntos pertinentes al trabajo." *Catholic Bishop of Chicago*, supra, pág. 1123.

Otras áreas de acción presentarían serios conflictos. En primer lugar las escuelas parroquiales vendrían obligadas a suministrar información en un sinnúmero de circunstancias bajo el deber de negociar de "buena fe". Para ello, recordemos que la Junta tiene una amplia facultad de supervisión y para ordenar la producción de testigos y evidencia documental. "Si, por ejemplo, las escuelas argumentaran que las limitaciones presupuestarias impiden una solicitud de aumento salarial, entonces vendrían obligadas a abrir para inspección sus libros o estarían sujetas a una querella sobre práctica ilícita." Bastress, *op. cit.*, pág. 321. Así también, la inclusión mandatoria de ciertos asuntos que bajo la ley el patrono viene obligado a discutir si los empleados o la unión lo solicitan plantearía cuestiones delicadas sobre libertad de culto.

A base del ámbito del culto católico, se nos argumenta que la Junta actuaría únicamente sobre aspectos de carácter obrero-patronal sin intervenir en la fase religiosa ni en el esfuerzo de ofrecer instrucción religiosa. Tal propuesta es peligrosa y, además, parte de una visión restrictiva que circunscribe la religión a la observancia de unas solemnidades, olvidando que más que unos ritos, la religión es una forma de vivir. Implicaría que la Junta tendría que estar constantemente distinguiendo entre asuntos religiosos y seglares. Esta

determinación no podría hacerse en el vacío, sino que conllevaría poner en movimiento la maquinaria investigativa y adjudicativa de la Junta: el escrutinio gubernamental sobre áreas religiosas sería constante, intolerable y gravoso.

De igual modo visualizamos los difíciles choques que surgirían del incumplimiento de las obligaciones que la cláusula novena (9) del contrato impone a los maestros laicos en la Academia San Jorge al disponer: "Entiendo que la Academia San Jorge es una Escuela Católica Romana; por lo tanto, principios y guías religiosas son parte de mi responsabilidad como miembro de la facultad de la Academia". Bajo esta disposición, la Junta podría cuestionar y pasar juicio sobre materia doctrinal eclesiástica en despidos o falta de renovación de contratos bajo distintos supuestos. ([8])

## VI

Es nuestra convicción que el asumir jurisdicción la Junta en el caso de autos representaría una indebida intromisión, por operación de ley, de índole excesiva y de efectos inhibitorios en asuntos claramente protegidos por la libertad de culto. Se violenta la neutralidad que exigen las cláusulas religiosas, *pues se convertiría al Estado en un adversario.* Recordemos que la libertad de conciencia va a lo más profundo de la dinámica del ser humano. Está atada a distintas actividades y enfoques tales como la familia, la educación, el sexo, el amor, la muerte y otros. En el año 1952 la Asamblea Constituyente aceptó "con beneplácito la existencia de escuelas

---

([8]) Tales como: (1) enseñanza contraria a los principios de la iglesia sobre materia sexual o de otra índole; (2) matrimonio del maestro con una persona divorciada; (3) negativa a estructurar el curso de religión según las directrices de sus superiores. Estos ejemplos no son especulativos. Están basados en hechos verídicos discutidos por la Corte del Séptimo Circuito en la opinión de *Bishop of Chicago,* supra, pág. 1125. En situaciones análogas u otras parecidas, el descargo de las labores de la Junta implicaría que ésta indebidamente tendría que entrar a examinar la validez de la doctrina religiosa en que se funda la acción de la escuela impugnada. Consúltese: *McCormick* v. *Hirsch,* 460 F.Supp. 1337, 1355 (1978).

particulares, inclusive escuelas religiosas". *Op. cit.*, pág. 2564. Para aquella época la Junta no intervenía con las escuelas parroquiales y religiosas del país. El legajo de la Constituyente no contiene incidente o mención que expresamente aborde este problema.([9]) Por el alto sitial que se le otorgó a la libertad de culto, es razonable presumir que sus participantes no contemplaron cambio en la política gubernamental entonces vigente. Examinado nuevamente dicho foro a la luz del Puerto Rico de hoy se impone igual solución.

Aunque reconocemos que la Ley de Relaciones del Trabajo intenta y contiene, en la protección de los derechos de los maestros querellantes, un propósito y efecto secular, somos de opinión que su aplicación implica que el Estado habrá de intervenir y entremezclarse excesivamente en la administración de una actividad fundada, impregnada e inmersa en una doctrina esencialmente religiosa. Si a estas escuelas se les quita su apellido de *católica*, cesa su razón de ser.

El cúmulo de efectos e intervenciones que conllevaría acceder a la contención de la Junta, el impacto negativo fiscal, el resultado inhibitorio sobre los padres, la disolución de una reconocida línea de autoridad eclesiástica, basada en derecho canónico,([10]) —la relación entre la iglesia y los maestros— y más aún, el trastoque de una tradición y creencia religiosa que hasta el presente ha funcionado en completa armonía con las autoridades gubernamentales, nos lleva a concluir que son muchos los riesgos y peligros que para nuestra democracia y sistema constitucional la actuación de la Junta representaría.

---

([9]) Resulta inaplicable al caso de autos el argumento de que en Italia "todo el personal laico *externo* de las escuelas privadas de afiliación religiosa o no, gozan tales derechos". El diseño constitucional de Puerto Rico sigue —en materia de cláusulas religiosas— al norteamericano y *no* al italiano. Allá la Constitución está reglamentada por los pactos letranos (Art. VII, Constitución Italiana); aquí no existe acuerdo con la Iglesia. Al contrario, ésta, por mediación de la Academia, impugna la intervención e ingerencia del Estado en sus asuntos a través de la Junta.

([10]) De la Hera, *Introducción a la Ciencia del Derecho Canónico,* Ed. Tecnos, 1967, pág. 56.

Somos celosos en la protección de todas las libertades, pero la de culto merece especial deferencia. Ello explica el porqué, en el balance de valores en conflicto, el interés del Estado y los derechos constitucionales de los maestros laicos están cualificados y restringidos por la naturaleza eminentemente religiosa de las escuelas parroquiales católicas. Aquéllos deben ceder en esta particular y única controversia ante la importancia de la prerrogativa religiosa. (¹¹)

Finalmente, es cuestionable y altamente especulativo concluir que las "condiciones de trabajo [de los maestros laicos en las escuelas parroquiales] son muy inferiores a las que prevalecen en las escuelas públicas. Sus salarios son más bajos".

---

(¹¹) El argumento de que la Junta ha intervenido en entidades pertenecientes o administradas por iglesias —*Ryder Memorial Hospital* (P-2571—1968) ; *Hospital Episcopal San Lucas* (P-2578—1968, P-2639—1969, P-2823—1972, P-3110—1973) ; *Academia Discípulos de Cristo de Bayamón y la Asociación de Maestros de la Academia Discípulos de Cristo de Bayamón* (P-3042—1972) ; *Cementerio Católico Porta Coeli y Unión de Tronquistas de Puerto Rico, Local 901* (P-3294—1977) ; *Universidad Católica de Puerto Rico* (P-2324 y P-2293—1965-66) ; *Hospital Episcopal San Lucas y Federación Puertorriqueña de Sindicatos Democráticos* (CA-4690, D-660) ; *Hospital Episcopal San Lucas y Víctor Manuel Valle* (CA-5774—1977) ; *Hospital de la Concepción v. Federación de Enfermeras Prácticas* (CA-5050) y, finalmente, el caso de *Imprenta La Milagrosa v. Unión de Tipógrafos de Puerto Rico,* (CA-3060)— no milita en contra de esta decisión. En ninguno de ellos se impugnó la intervención de la Junta. Es de presumir que sólo el de la *Academia Discípulos de Cristo de Bayamón* tenía como trasfondo una escuela del primer nivel de enseñanza, y este caso fue retirado por las partes con la aprobación del presidente de la Junta, por razón de arreglo informal por la vía administrativa. (Véase comunicación de la Junta en autos, de 3-6-80.) Las restantes entidades tales como cementerio, hospital e imprenta, aunque de cierta orientación religiosa, *son claramente diferenciables del proceso profundo de enseñanza religiosa que, según hemos visto, como razón de doctrina permea y late manifiestamente en las escuelas parroquiales.*

Ello traza la línea divisoria y explica además las razones por qué no es necesario ni se justifica eximir a las iglesias de todas las leyes de impacto fiscal, tales como las del Fondo del Seguro del Estado, seguro por desempleo, salario mínimo y otras. Ninguna de estas leyes, al ser implementadas, causan las consecuencias e impacto que plantea el ejercicio de la jurisdicción por la Junta sobre la figura clave del maestro laico.

No hay en los autos evidencia de ello, excepto una mención de que los días de la licencia por enfermedad en el contrato eran menores que los concedidos por la ley. Al advertirse de ese hecho, la dirección escolar de la Academia enmendó inmediatamente el contrato a los fines de ajustarlo a la ley. Ello indica una disposición de cumplir a cabalidad con los principios de justicia laboral encarnados en leyes específicas. De hecho, la discrepancia en escalas salariales entre las escuelas públicas y parroquiales no es notable. Es conveniente aclarar que estas últimas se rigen por el salario mínimo federal, que ciertamente no representa un salario de "desvalidos".

Repetimos, no es necesario inmunizar las escuelas de orientación religiosa de todas las leyes sociales obrero-patronales. Sólo de la jurisdicción de la Junta y limitado a los maestros por las características particulares del ejercicio de esa jurisdicción. Nuestra adhesión a la Constitución nos exige consistencia doctrinal. Hay ciertos principios de igualdad que no se extienden, por razón de las cláusulas religiosas, a ciertas relaciones. En tales instancias, los tribunales se abstienen de proveer remedios aunque ello puede representar un aparente quebrantamiento contractual. *Agostini*, supra.

Por los fundamentos expuestos, debe desestimarse la querella. Lo contrario representaría un fatídico precedente que permitiría al Estado laico, a través de la Junta, desmantelar lenta pero irremediablemente, las escuelas de orientación religiosa del país, infringiendo y cercenando así el principio constitucional de libertad de culto.

... [Y]a se oculta bajo el anonimato de la democracia electiva, ya se proclama dictador a rostro descubierto el "Minotauro" —"Leviathan" decía Hobbes y repite Alain— "indefinidamente protector", pero por correlación "indefinidamente autoritario". Jean-Jacques Chevalier, *Los Grandes Textos Políticos,* citado por José M. Martínez Val, *Desarrollo Jurídico y Desarrollo Político,* Rev. General de Derecho, 1974, pág. 834.

—o—

Opinión disidente del Juez Presidente, Señor Trías Monge, a la que se unen los Jueces Asociados Señores Rigau y Torres Rigual.

San Juan, Puerto Rico, a 30 de junio de 1980

La cuestión por resolver es si la Junta de Relaciones del Trabajo de Puerto Rico puede válidamente ejercer jurisdicción sobre maestros laicos de la entidad educativa recurrente. No comparto la tesis de que existe un derecho constitucional de cometer prácticas ilícitas del trabajo en nombre de la religión.

La cuestión constitucional que este caso plantea es irrehuible. La Junta de Relaciones del Trabajo de Puerto Rico, a distinción de la de Estados Unidos, *NLRB* v. *Catholic Bishop of Chicago*, 440 U.S. 490 (1979), posee jurisdicción incuestionable para dirimir la querella interpuesta contra la Academia San Jorge por unos maestros laicos que alegaron ser despedidos ilegalmente por intentar asociarse para su protección mutua.

Las definiciones de las voces "patrono" y "empleado" que utiliza la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130, de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. sec. 61 *et seq.*, son en extremo amplias. El término "patrono" recibió forma final en la Ley Núm. 6, de 7 de marzo de 1946. La legislación actual, 29 L.P.R.A. sec. 63(2), incluye la siguiente definición de entonces:

El término "patrono" incluirá ejecutivos, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente, pero no incluirá excepto en el caso de las instrumentalidades corporativas del Gobierno de Puerto Rico como más adelante se definen, al Gobierno ni a ninguna subdivisión política del mismo; Disponiéndose, que incluirá, además, a todo individuo, sociedad u organización que intervenga a favor de la parte patronal en cualquier disputa obrera o negociación colectiva.

La definición vigente de "empleado", 29 L.P.R.A. sec. 63(3), también se remonta a la Ley Núm. 6, de 7 de marzo de 1946:

El término "empleado" incluirá a cualquier empleado, y no se limitará a los empleados de un patrono en particular, a menos que la Ley explícitamente lo exprese en contrario, e incluirá a cualquier individuo cuyo trabajo haya cesado como consecuencia de, o en relación con cualquier disputa obrera, o debido a cualquier práctica ilícita de trabajo, pero no incluirá a ningún individuo empleado en el servicio doméstico en el hogar de cualquier familia o persona ni a ningún individuo empleado por sus padres o cónyuge. El término no incluirá ejecutivos ni supervisores.

En *Junta Rel. Trabajo* v. *Club Deportivo*, 84 D.P.R. 515, 523–24 (1962), subrayamos la amplitud del término "patrono":

El término "patrono" contenido en leyes de esta índole no debe ser interpretado en forma tal que se frustren los propósitos de la ley . . . . La amplitud de la definición es señal inequívoca de la intención de que en casos de duda debe preferirse una interpretación que sea compatible con la realidad económica que se tiende a mejorar en lugar de limitarla a los conceptos tradicionales de la definición de "patrono" . . . .

Las definiciones de nuestra ley son lo suficientemente amplias para comprender entre los patronos sujetos a sus disposiciones a asociaciones sin beneficio pecuniario . . . .

Señalamos también, *ibid.*, pág. 520, que las personas exceptuadas de la ley son únicamente las excluidas expresamente en las definiciones transcritas. Convalidamos así la decisión de nuestra Junta de Relaciones del Trabajo. *Club Deportivo de Ponce, Inc.* (P. 1525, D-215) 3 DJRT 41.

En armonía con la amplitud de las definiciones reseñadas, nuestra Junta ejerció su jurisdicción sobre una escuela religiosa utilizada para la enseñanza elemental, intermedia y superior, antes que la Junta de Relaciones del Trabajo de Estados Unidos interviniese en el caso de institución alguna de esta índole. Compárese *Academia Discípulos de Cristo*

*de Bayamón*, (72-413-P-3042, D-29-72-637) 1972,([1]) con
*Henry M. Hald High School Association*, 213 NLRB 415
(1974). Las raíces teóricas de ambas decisiones son hondas,
aunque no alcanzan la situación precisa envuelta aquí. Ver
*Recent Decisions: Lay Teachers in Church Operated Schools*,
18 Duquesne L. Rev. 135 (1979); *Club Deportivo de Ponce*,
supra. En el caso de la Junta de Relaciones del Trabajo de
Estados Unidos, las raíces arrancan de *Christian Board of
Publication*, 13 NLRB 534 (1939), 113 F.2d 678 (8vo Cir.,
1940).

*Catholic Bishop of Chicago*, supra, el único caso en que
se funda la recurrente, no nos ayuda a interpretar nuestra
Ley de Relaciones del Trabajo. *Catholic Bishop* simplemente
resuelve que la Ley de Relaciones del Trabajo de Estados
Unidos no le confiere jurisdicción a la Junta federal sobre
las escuelas operadas por las iglesias. Aun después de *Catho-
lic Bishop*, esta Junta ejerce jurisdicción sobre las escuelas
afiliadas, en vez de operadas, por las iglesias. *Roman Catholic
Diocese of Brooklyn et al.*, 101 LRRM 1436 (1979). *Catholic
Bishop* tampoco resuelve, contrario a la posición de la recu-
rrente, las cuestiones constitucionales que el caso de autos
presenta. ([2])

La Junta de Relaciones del Trabajo de Puerto Rico tiene,
en consecuencia, jurisdicción sobre los maestros laicos de las
escuelas patrocinadas u operadas por cualquier iglesia o afi-
liadas a ésta. Aun la propia recurrente admitió ante la Junta
en su contestación a la querella, que la Academia San Jorge
es un patrono dentro del significado de la Ley de Relaciones
del Trabajo.

Corresponde en tales circunstancias determinar si existe
obstáculo constitucional alguno al ejercicio de esa jurisdic-

---

([1]) El hecho de que, después que la Junta emitió su decisión, las partes
acordaran el cese ulterior de los procedimientos, no milita en contra del
ejercicio por la Junta de su jurisdicción en este caso.

([2]) Para una crítica severa de *Catholic Bishop*, véase: *The Supreme
Court, 1978 Term*, 93 Harv. L. Rev. 1, 254-63 (1979).

ción. El Art. II, inciso 6 de la Constitución del Estado Libre Asociado de Puerto Rico expresa:

Las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares.

Los incisos 16 y 17 del Art. II disponen:

16. Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley.

17. Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar.

De otro lado, el Art. II, inciso 3, provee:

No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado.

Los contornos de las cláusulas relativas a la religión son difíciles de trazar en muchos casos. Hubo un tiempo, por ejemplo, en que en Estados Unidos se hablaba con aplomo del "muro" de separación entre el estado y la iglesia. *Everson* v. *Board of Education*, 330 U.S. 1, 16 (1947). Era la época de la generalización confiada, la expresión excesivamente abarcadora. De ahí se ha pasado a la particularización, al aserto limitado y precavido. Hoy no se habla de un alto muro, fácilmente visible, sino de "una barrera borrosa, poco clara y variable que depende de todas las circunstancias de una rela-

ción particular". *Lemon* v. *Kurtzman,* 403 U.S. 602, 614 (1971).

En el caso de autos nos hallamos en terreno escarpado y neblinoso. No hay postes indicadores, guías esclarecedoras. La parte recurrente nos pide que alteremos el statu quo, que anulemos una ley anterior a la Constitución y que en nombre de parte de esa Constitución dejemos sin efecto otras de sus disposiciones. Considero que en las circunstancias presentes no debemos tomar una determinación de tan graves consecuencias, a menos que sea inescapable. Los materiales existentes demuestran la improcedencia del heroico y devastador remedio que se nos solicita.

Lo que se nos requiere es nada menos que este Tribunal autorice que se deje a la entera merced de las autoridades eclesiásticas, entrañe o no discriminación, el reconocimiento del derecho de sus maestros laicos a asociarse libremente, a la negociación colectiva, a recibir igual paga por igual labor y a acordar normas razonables de trabajo. Examinemos esta solicitud a la luz de los datos disponibles, antes de juzgar su validez en ley.

El número de maestros laicos en las escuelas parroquiales va en aumento. En términos generales, sus condiciones de trabajo son muy inferiores a las que prevalecen en las escuelas públicas. Sus salarios son más bajos. A los maestros laicos no se les reconoce usualmente el derecho al retiro y a la permanencia. Los maestros laicos en las escuelas parroquiales desempeñan, no obstante, labores básicamente iguales a las de otros maestros. Note, *The Religion Clauses and NLRB Jurisdiction over Parochial Schools,* 54 Notre Dame Law. 263, 280 (1978).

En consideración del estado de desvalimiento de este dedicado grupo de educadores, treinta y tres estados les han reconocido por estatuto el derecho a organizarse. Varios otros estados proclaman la existencia de ese derecho como cuestión de interpretación constitucional. *Ibid.,* n. 148. El resultado de

las opiniones de la mayoría es colocar a Puerto Rico a la retaguardia de las jurisdicciones con relaciones análogas entre la iglesia y el estado.

Si analizamos separadamente, como es nuestro deber, las cláusulas relativas a la religión, observaremos que éstas no anulan nuestra Ley de Relaciones del Trabajo en el caso presente, ni dejan sin efecto parte alguna de la Constitución del Estado Libre Asociado. Comencemos por la cláusula referente a la libertad de culto.

A fin de poder invocar esta cláusula, el promovente tiene que demostrar que su reclamación se funda en una creencia religiosa. *Wisconsin* v. *Yoder*, 406 U.S. 205, 215 (1972). Si se exige inmunidad para acciones que constituyen un discrimen, hay que probar que ese discrimen es parte esencial del credo religioso y que sirve intereses más valiosos que el interés en la igualdad de los seres humanos. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum. L. Rev. 1514, 1516 (1979); Comment, *Are Churches Above the Law? The Application of the Fair Labor Standards Act and the Equal Pay Provisions of Title VII to Religious Organizations*, 40 U. Pitt. L. Rev. 465, 483 (1979); Kryvoruka, *The Church, the State and the National Labor Relations Act: Collective Bargaining in the Parochial Schools*, 20 William & Mary L. Rev. 33, 52–53, 57 (1978).

No se ha probado en este caso que la organización de los maestros laicos en las escuelas parroquiales es contraria a la doctrina católica, ni que el credo católico requiere absoluta libertad de la iglesia para imponer a sus maestros laicos las condiciones de trabajo que desee, aunque sean inferiores a las de otros maestros. Aunque esto pudiese demostrarse en el caso de cualquier iglesia, se ha estimado que prevalecerían la constitución y las leyes del estado concernido, ya que al aprobar normas generales de trabajo como las que aquí nos conciernen, se afecta tan solo de modo incidental, a lo sumo, la

práctica de la religión. Kryvoruka, *op. cit.*, pág. 53; Comment, *Are Churches above the Law? . . .,* supra, pág. 483. El ejercicio de jurisdicción por la Junta de Relaciones del Trabajo en este pleito no constituye, en consecuencia, una violación a la libertad de culto. P. R. Moots & E. McG. Gaffney, Jr., *Church and Campus,* U. of Notre Dame Press, 1977, pág. 71; Note, *The Religion Clauses and NLRB Jurisdiction over Parochial Schools,* 54 Notre Dame Law. 263, 287 (1978).

En lo que respecta a la cláusula sobre el establecimiento de cualquier religión, debe satisfacer los siguientes criterios tradicionales para resistir un ataque en su nombre: la legislación debe tener un propósito secular, su efecto primario debe ser secular también y ella no debe promover una involucración excesiva con la religión. *Wolman* v. *Walker,* 433 U.S. 229 (1977); *Committee for Public Education* v. *Nyquist,* 413 U.S. 756 (1973); *Tilton* v. *Richardson,* 403 U.S. 672 (1971).

El propósito y el efecto primordialmente seculares de nuestra Ley de Relaciones del Trabajo y de las disposiciones constitucionales que garantizan el derecho a asociarse, a negociar colectivamente, a recibir igual paga por igual trabajo y otras libertades son incuestionables. Note, *The Religion Clauses and NLRB Jurisdiction over Parochial Schools,* 54 Notre Dame Law. 263, 286–87 (1978); Kryvoruka, *op. cit.,* págs. 62, 75 *et seq.* (1978).

Una de las opiniones mayoritarias argumenta, aparentemente en lo que concierne al criterio del factor secular, que el ejercicio de su jurisdicción por la Junta "aumentaría el poder persuasivo y de regateo (*bargaining power*) de los maestros laicos empleados, lo que a su vez directamente ampliaría los gastos de nómina de la escuela por razón de un incremento en los salarios". El argumento es curioso. ¿Es que las cláusulas sobre la religión se diseñaron para justificar salarios bajos y otras condiciones inadecuadas de trabajo? La opinión no cita autoridad alguna a favor de tal proposición. También le preocupa la solvencia económica de las escuelas y

utiliza este doloroso hecho para anular, en beneficio de una institución eclesiástica y en detrimento de sus maestros laicos, la Ley de Relaciones del Trabajo y partes de nuestra Constitución. Mas, ¿qué sucede entonces con las escuelas privadas sin afiliación eclesiástica que sufren el mismo mal? Véase: Boles, *Persistent Problems of Church, State and Education*, 1 J.L. & Educ. 601, 605 (1972). Si se exime a unas y no a otras nos enfrentamos a una crasa violación de la cláusula sobre la separación del estado y la iglesia, ya que se estaría dando tratamiento preferente a instituciones eclesiásticas. Comment, *Are Churches Above the Law?* . . ., ante, pág. 485. Si la solvencia económica ha de ser un factor en estos casos, ¿dónde se trazaría la línea? *Cf. Braunfeld* v. *Brown*, 366 U.S. 599 (1961). ¿Por qué no excluir también a los hospitales, los cementerios, las imprentas y otras actividades eclesiásticas, mantenidos a costa de grandes sacrificios, sobre los que la Junta de Relaciones del Trabajo de Puerto Rico ha ejercido jurisdicción tradicionalmente? ¿Y por qué no eximir a las iglesias de todas las leyes, que son muchas, que afecten su situación fiscal?

El tercer factor, el de la alegada involucración excesiva, es el más complejo. Una de las opiniones concurrentes menciona zonas donde habría involucración, aunque no inconstitucionalmente excesiva, y otras donde no podría haberla. Sobre estas últimas se señala, por ejemplo, que "la Junta podría cuestionar y pasar juicio sobre materia doctrinal eclesiástica en despidos o falta de renovación de contratos bajo distintos supuestos". ¿A base de qué principios podría la Junta efectuar estas cosas prohibidas por la Constitución? *Agostini* v. *Iglesia Católica*, 109 D.P.R. 172 (1979). Este argumento ha sido correctamente rechazado por diversos comentaristas. Kryvoruka, *The Church, the State and the National Labor Relations Act: Collective Bargaining in the Parochial Schools*, 20 William & Mary L. Rev. 33, 60 (1978). Se ha analizado extensamente el grado de intrusión que se crearía

en casos exactamente iguales al presente y, aunque hay autores que llegan a la conclusión contraria, otros estiman que no existe impedimento alguno de índole constitucional para el ejercicio de su jurisdicción por la Junta en modo tal que no afecte los intereses religiosos legítimos de los patronos. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum. L. Rev. 1514, 1549 (1979); Note, *The Religion Clauses and NLRB Jurisdiction over Parochial Schools*, 54 Notre Dame Law. 263, 286–87 (1978); P. R. Moots & E. McG. Gaffney, Jr., *Church and Campus*, U. of Notre Dame Press, 1977, pág. 71; Kryvoruka, *op. cit.*, págs. 60–65, 75 *et seq.*

La posición de estos comentaristas es la más razonable. La evaluación del modo en que se ha aplicado la Ley de Relaciones del Trabajo de Estados Unidos a los maestros laicos de las escuelas parroquiales, demuestra que el grado de intrusión estatal en la esfera religiosa es puramente incidental. Es posible un acomodo entre los vitales intereses en pugna. De una parte, la Junta podrá proteger a estos maestros laicos de discrímenes relativos a sus condiciones de trabajo. De la otra, la Junta no podrá inquirir o pasar juicio sobre cuestiones eclesiásticas. ¿En qué forma es que la eliminación de discrímenes, ordenada constitucionalmente, puede conmover los cimientos de la religión? ¿Cómo es que afecta la doctrina religiosa el hecho de que los maestros laicos se asocien para solicitar salarios justos y condiciones más adecuadas de trabajo? ¿No son tan hijos de Dios como otros maestros? ¿Se puede discriminar contra ellos en nombre de la religión? Lo que es inconstitucional es precisamente permitir lo que las opiniones mayoritarias permiten en este caso. Los autores de *Church and Campus*, U. of Notre Dame Press, 1971, pág. 71, han escrito:

Sostenemos también que no es constitucionalmente permisible la concesión a colegios afiliados a entidades religiosas de una inmunidad absoluta contra la prohibición general de la dis-

criminación en el empleo en nombre de la religión, ya que el deber de los tribunales es proteger tanto los intereses religiosos de tales patronos como la libertad religiosa de sus empleados, presentes o futuros.

Kryvoruka, *op. cit.*, pág. 83, concluye a su vez:

No existe derecho constitucional alguno a cometer prácticas ilícitas del trabajo. Los intereses de los maestros laicos en sus sueldos, horas de trabajo y condiciones de trabajo exigen que se les reconozcan los derechos garantizados por la N.L.R.A., cuando ello no afecte directamente los intereses religiosos de sus patronos.

En el legítimo deseo de proteger los intereses religiosos envueltos en el caso presente, las opiniones mayoritarias emplean, al analizar el factor de la intrusión excesiva, criterios demasiado amplios. Ello crea problemas muy serios en relación con otras leyes laborales. Si no se aplica la Ley de Relaciones del Trabajo, ¿se aplican las leyes federales sobre Normas Razonables del Trabajo y la de Igual Paga por Igual Trabajo? Véase: Comment, *Are Churches Above the Law? The Application of the Fair Labor Standards Act and the Equal Pay Provisions of Title VII to Religious Organizations,* 40 U. Pitt. L. Rev. 465 (1979). ¿Y la infinidad de leyes laborales locales aprobadas para proteger a los trabajadores contra el discrimen? Véase: 29 L.P.R.A. sec. 1 *et seq.*

Respecto a la tercera cláusula relativa a la religión, la concerniente a la separación entre la iglesia y el estado, (³) cuyas tangencias con las otras dos cláusulas son evidentes, el criterio decisivo es la neutralidad de la acción concernida. El estado no puede actuar primordialmente para beneficiar o perjudicar a la iglesia. Véase: P. Kurland, *Religion and the Law,* Chicago, 1962, pág. 112. La Ley de Relaciones del Trabajo se aprobó para beneficio general de las clases obreras

---

(³) Este principio recibió, por razones históricas, reconocimiento expreso en la Constitución del Estado Libre Asociado. En Estados Unidos deriva de la Primera Enmienda.

del país. Como hemos visto, su propósito y efecto primarios son enteramente seculares. No puede invocarse aquí esta tercera cláusula.

Si echamos a un lado los criterios tradicionales, los mencionados y otros que se han utilizado en ocasiones, para juzgar si se han violado las cláusulas relativas a la religión, observaremos que en el fondo no es posible escapar a la evaluación de los valores en conflicto ni al intento de armonizarlos en todo lo posible. Así como los problemas constitucionales deben evadirse, a menos que sea inevitable confrontarlos, debemos evitar establecer jerarquías entre valores si es factible lograr el equilibrio entre ellos. Este principio adquiere especial importancia cuando los valores en pugna, real o aparente, son parte de la misma constitución.

Estimo que este caso no exige que sacrifiquemos unos intereses por otros. Podemos proteger, como debemos proteger, los intereses de la religión en las circunstancias presentes, mas sin anular aquellos derechos de los maestros laicos, que no afecten los intereses centrales de la religión. En la propia Italia, todo el personal laico externo de las escuelas privadas, de afiliación religiosa o no, gozan de tales derechos. A. Vitale, *Ordinamento Giuridico e Interessi Religiosi: Corso di Diritto Ecclesiastico*, Milán, D. A. Giuffré, ed. 1979, pág. 12. ([4])

Del análisis efectuado en el curso de la opinión hemos visto que es posible permitir el ejercicio por la Junta de su jurisdicción sobre los maestros laicos de las escuelas parroquiales, a la par que se le prohíbe intervenir en asuntos puramente eclesiásticos. Los intereses de la religión no exigen el total desamparo de los maestros laicos. Basta con que inmunicemos parcialmente a estas escuelas, hasta el grado imprescindible requerido por sus nexos eclesiásticos específicos. La

---

([4]) Los derechos reconocidos por el apartado segundo del Art. 38 de la Constitución italiana han sido extendidos recientemente aun a los sacerdotes y otro personal no laico. *Ibid.*, pág. 110, donde se cita la decisión de la Corte Constitucional Italiana de 9 de junio de 1977.

inmunidad total, que es la que da margen al discrimen, es innecesaria e improcedente. Véanse: Comment, *Are Churches above the Law? . . .*, 40 U. Pitt. L. Rev. 465, 483 (1979); Bagni, *loc. cit.;* P. R. Moots & E. McG. Gaffney, Jr., *Church in Campus*, U. of Notre Dame Press, 1979, pág. 71; Kryvoruka, *The Church, the State, and the National Labor Relations Act: Collective Bargaining in the Parochial Schools*, 20 William & Mary L. Rev. 33, 75 *et seq.* (1979).

El enfoque sugerido es el más prudente. Particulariza más. Evita las generalizaciones de latitud extrema. Distingue entre zonas de intensidad diferente. Le permite a la recurrente eludir la jurisdicción de la Junta mediante el cumplimiento tan solo de los criterios expuestos en *Roman Catholic Archidiocese of Baltimore*, 88 LRMM 1169 (1975).[5] Armoniza las disposiciones constitucionales envueltas. No hay indicio en los debates de la Convención Constituyente de intención alguna de negarles a un grupo de empleados privados los derechos que se les estaban reconociendo a otros. Por el contrario, para el tiempo de la Constitución ya existía la definición del vocablo "patrono" que conocemos hoy. No puede negarse en nombre de la religión, y mucho menos de una religión cristiana, el principio de la igualdad entre los seres humanos.

Confirmaría la resolución de la Junta recurrida, que denegó la moción de desestimación de la recurrente por falta de jurisdicción.

—O—

Opinión disidente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 30 de junio de 1980

Lamento tener que disentir. Estimo que en este caso se trata de una controversia obrero-patronal y no de una con-

---

[5] No nos estamos expresando sobre problema constitucional alguno que pueda surgir de la utilización de la norma formulada en el caso citado.

troversia sobre doctrina religiosa. Si se tratase de esto último, la Iglesia sería soberana. Pero àl tratarse de una materia tan investida del interés público temporal como son las relaciones obrero-patronales, la Iglesia no puede estar inmune de regulación estatal.

En estas cosas importantes no puede conformarse uno con las expresiones aisladas de unos casos abundantes, contradictorios y que no nos obligan. Véase sobre esto lo expresado por John Wigmore, I *Wigmore on Evidence*, 3ra ed., 1940, Sec. 8a.

Como hemos tenido ocasión de señalar antes, los árboles no deben impedirnos ver el bosque. Hay que ir al pensamiento, a los fundamentos históricos y profundos del problema; problema que tiene sus orígenes por lo menos desde la Edad Media. Rota la síntesis del Imperio Romano, en el cual la Iglesia Católica, Apostólica y Romana era la iglesia oficial, y luego del feudalismo anárquico y fragmentario, desde que surgieron monarcas que gobernaban, más o menos, a diversas naciones, surgió la milenaria controversia entre el poder espiritual y el poder temporal.

La Iglesia y el Estado coinciden en buscar el bien común, espiritual y temporal. Algunos papas en la Edad Media hablaron de las "dos espadas", para indicar que el poder temporal debía ir unido al poder espiritual. El símil de las dos espadas no fue uno feliz, aunque pegó. Pudo haberse utilizado uno que sugiriese más amor, la concordia y la convivencia, pero cada época tiene sus tensiones y cada hombre su circunstancia. El filósofo político inglés Tomás Hobbes utilizó dicho símil en su *Leviatán* para poner las dos armas en manos del Estado totalitario. Después de la reforma protestante, algunos estados adoptaron la fórmula práctica de *cuius regio, eius religio;* cada gobernante decidiría la religión de sus súbditos. La fórmula sería práctica por algún tiempo, pero son obvias sus injusticias y su insuficiencia filosófica.

Algunos autores estiman que la mejor fórmula para el mundo actual es lo que llaman la separación amistosa, haciendo bien cada uno lo suyo, sin intentar mandar uno al otro, no intentando la Iglesia que el Estado le preste su poder coactivo para afirmar su orden espiritual y moral, y no pretendiendo, por su parte, el Estado que la Iglesia le dé su respaldo a lo que son opciones políticas temporales y opinables.

Aún dentro de nuestro sistema de separación de la Iglesia y el Estado, como hay materias que son de la incumbencia de la primera y otras de la incumbencia del segundo, y siendo el derecho laboral materia de la incumbencia del Estado, no se puede dejar al exclusivo arbitrio de las autoridades eclesiásticas la regulación del derecho de los maestros laicos de asociarse y negociar colectivamente sus condiciones de trabajo.

Debe ser claro que el ejercicio por la Junta de Relaciones del Trabajo de sus funciones en el caso de autos, en forma alguna viola la libertad de culto que garantiza nuestra Constitución. Como hemos dicho, en este caso no está envuelta la libertad de culto. Se trata de salarios.

Entiendo, como señalé antes, que si se tratase de una controversia sobre doctrina religiosa, la Iglesia tendría la última palabra; pero tratándose de una controversia obrero-patronal, la Iglesia, que es patrono de miles de maestros y de empleados en Puerto Rico, no puede gozar de inmunidad y constituir una jurisdicción aparte en unas materias tan afectadas por el interés público y que corresponde al Estado regular. Lo contrario se prestaría concebiblemente para dejar un gran sector de nuestra fuerza profesional y obrera sin la protección de las leyes laborales y para que se cometiesen graves injusticias. Por eso, yo sostendría la decisión de la Junta de Relaciones del Trabajo de Puerto Rico.